**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Richmond Division)**



| | | |
|---|---|---|
| [UNDER SEAL], | § | **FILED IN CAMERA AND** |
| | § | **UNDER SEAL PURSUANT TO** |
| vs. | § | **31 U.S.C. § 3730** |
| | § | |
| [UNDER SEAL] | § | Civil Action No. **3:19-cv-00397-JAG** |
| | § | |
| | § | |
| | § | **FILED IN CAMERA** |
| | § | **AND UNDER SEAL** |
| | § | |
| | § | **DO NOT ENTER INTO PACER** |
| | § | **DO NOT PLACE IN PRESS BOX** |
| | § | **DO NOT SERVE DEFENDANTS** |
| | § | |
| | § | |
| | § | |
| | § | |

# FILED UNDER SEAL

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### (Richmond Division)



|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| ex rel. Richard V. Morrow, | § | |
| and | § | Civil Action No. **3:19-cv-00397-JAG** |
| COMMONWEALTH OF VIRGINIA | § | |
| ex rel. Richard V. Morrow, | § | |
|  | § | **JURY TRIAL DEMAND** |
| Plaintiffs, | § | |
|  | § | |
| vs. | § | **FILED IN CAMERA** |
|  | § | **AND UNDER SEAL** |
| THE SHELTERING ARMS HOSPITAL, | § | **PURSUANT TO** |
| THE SHELTERING ARMS HOSPITAL | § | **31 U.S.C. § 3730** |
| SOUTH, SHELTERING ARMS | § | |
| PHYSICAL REHABILITATION | § | **DO NOT ENTER INTO PACER** |
| ASSOCIATES, LLC, SHELTERING | § | |
| ARMS THERAPY CLINICS, LLC, THE | § | **DO NOT PLACE IN PRESS BOX** |
| SHELTERING ARMS CORPORATION, | § | |
| THE SHELTERING ARMS | § | |
| FOUNDATION, TIMOTHY M. SILVER, | | |
| §M.D., HILLARY S. HAWKINS, M.D., | | |
| GREGORY F. LEGHART, M.D., ALBERT | | |
| M. JONES, M.D. | | |

Defendants.

## COMPLAINT

1.  *Qui Tam* Relator, Richard V. Morrow, brings this action on behalf of the United States of America, the Commonwealth of Virginia, and himself to recover damages and penalties from the Defendants under the Federal False Claims Act and the Virginia Fraud Against Taxpayers Act.

2.  Defendants have knowingly submitted and caused the submission of claims to Federal and Virginia government healthcare programs that were false because they resulted from

violations of the Federal physician self-referral law, the Federal Anti-Kickback Statute, and the Virginia physician self-referral statute and Anti-Kickback Statute. In so doing, Defendants violated the Federal False Claims Act and the Virginia Fraud Against Taxpayers Act.

3.    As detailed herein, Defendants entered into financial relationships with referring physicians that did not satisfy any statutory or regulatory exception or safe harbor of the Federal and Virginia self-referral and anti-kickback laws. As a result, Defendants knowingly submitted and caused to be submitted thousands of false claims to the United States and Commonwealth of Virginia, which resulted in millions of dollars of reimbursement for claims that were ineligible for payment because of Defendants' unlawful conduct.

## JURISDICTION AND VENUE

4.    This action arises under the United States Civil False Claims Act, 31 U.S.C. sec. 3729, et seq.

5.    This Court has jurisdiction of the subject matter of this action pursuant to 31 U.S.C. sec. 3732(a) and U.S.C. sec 1331 and has personal jurisdiction over the Defendants, because Defendants transact business in this District.

6.    Venue is proper in this District under 28 U.S.C. sec. 1391 and 31 U.S.C. sec. 3732(a) because Defendants transact business and are headquartered within this District.

7.    Relator is the original source of these allegations and has direct and independent knowledge of the information herein within the meaning of the False Claims Act, 31 U.S.C. §§ 3730(e)(4)(B).

8.   Relator denies that there has been a public disclosure or that the facts alleged herein have been publicly disclosed in any Federal criminal, civil, or administrative hearing in which the Government or its agent is party in a Congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation.

9.   Should any public disclosure have occurred, unbeknownst to Relator, prior to the filing of this Complaint, Relator's knowledge is independent of such disclosure and Relator's knowledge would materially add to any public allegations or information.

10.  Prior to filing this Complaint, Relator voluntarily disclosed to the United States and the Commonwealth of Virginia the information on which his allegations are based.

## PARTIES

11.  Relator **Richard V. Morrow** is a citizen of the United States and resides in Virginia.  He has worked as a healthcare executive and medical practice administrator, primarily in Virginia, since 1972.  For approximately the last 25 years, Relator's worked as a senior director in the areas of hospital-based physician services, physician practice administration, and healthcare compliance.  Mr. Morrow is board certified in Healthcare Management and is a Fellow of the American College of Healthcare Executives (FACHE).  He is also a veteran of the U.S. Naval Reserve.  Mr. Morrow worked for Defendant, Sheltering Arms Hospital as the Associate Vice President for Physicians' and Psychology Services from August of 2017 through March of 2018.

12.  As the Associate Vice President for Physicians' and Psychology Services, Relator was responsible for the day to day operations of the Sheltering Arms rehabilitation practice, reporting directly to the Sheltering Arms Chief Operating Officer, Amy Showalter.

13.    The real parties in interest to the claims set forth herein are the United States of America and the Commonwealth of Virginia. Mr. Morrow, as *Qui Tam* Relator, seeks to recover damages and civil penalties arising from the Defendants' conduct in connection with Defendants' violation of the Federal False Claims Act, the Anti-Kickback Statute, and the Physician Self-Referral Law.

14.    Defendant **Sheltering Arms Hospital ("SAH")** is a 40-bed not-for-profit Virginia hospital corporation located at 8254 Atlee Road, Mechanicsville, VA 23116. SAH is also known as Sheltering Arms Hospital – Hanover. SAH's Medicare provider number is 493025. From at least 2009 to the present, SAH has provided inpatient and outpatient physical medicine and rehabilitative care, including outpatient physical therapy, outpatient occupational therapy, outpatient speech-language pathology services, and outpatient medical psychology and counseling services reimbursed by, and sought to be reimbursed by Medicare, Medicaid, TRICARE, CHAMPVA, the Federal Employees Health Benefit Program ("FEHB"), and other Federally-funded government healthcare programs.[1]

15.    SAH currently employs approximately 50 therapists and several medical psychologists that provide care to patients at all Sheltering Arms inpatient and outpatient facilities, including outpatient therapy services reimbursed by, and sought to be reimbursed by Medicare, Medicaid, TRICARE, CHAMPVA, FEHB, and other Federally-funded government healthcare programs.

---

[1] Hereinafter, all references to **"outpatient therapy services,"** shall include, without limitation, **outpatient physical therapy, outpatient occupational therapy, outpatient speech-language pathology services, and outpatient medical psychology and counseling services.**

16. Defendant **Sheltering Arms Hospital South ("SAHS")** is a 28-bed not-for-profit Virginia hospital corporation located at 13700 St. Francis Blvd, Suite 400, Midlothian, VA 23114. SAHS is also known as "the Midlothian Campus." SAHS' Medicare provider number is 493030. From at least 2009 to the present, SAHS has provided inpatient and outpatient physical medicine and rehabilitative care, including outpatient therapy services reimbursed by, and sought to be reimbursed by Medicare, Medicaid, TRICARE, CHAMPVA, FEHB, and other Federally-funded government healthcare programs.

17. Defendant **Sheltering Arms Physical Rehabilitation Associates, LLC, ("SAPRA")** is a for-profit, Virginia limited liability company medical group practice specializing in physical medicine and rehabilitative care with a principal office located at 140 East Shore Drive, Glen Allen, VA 23059. From at least 2009 to the present, SAPRA physicians and nursing staff have provided inpatient and outpatient therapy services at SAH, SAHS, and other Sheltering Arms-affiliated locations listed below and sought to be reimbursed by Medicare, Medicaid, TRICARE, CHAMPVA, FEHB, and other Federally-funded government healthcare programs. SAPRA receives financial support from SAH.

18. Defendant **Sheltering Arms Therapy Clinics, LLC, d/b/a PT Works ("PT Works")** is a Virginia limited liability company and Sheltering Arms facility located at 2296 John Rolfe Parkway, Henrico, VA 23233. From at least 2010 to the present, PT Works and Sheltering Arms employees have provided outpatient therapy services sought to be reimbursed by Medicare, Medicaid, TRICARE, CHAMPVA, FEHB, and other Federally-funded government healthcare programs.

19. Defendant **The Sheltering Arms Foundation ("SAF")**, is a Virginia not-for-profit foundation located at 8254 Atlee Road, Mechanicsville, VA 23116.   SAF manages investment funds for SAH and SAHS and provides direct financial support to SAH.

20. Defendant **The Sheltering Arms Corporation**, is a Virginia Corporation with a principal office located at 8254 Atlee Road, Mechanicsville, VA 23116, and a principal place of business in Richmond, Virginia.   The Sheltering Arms Corporation is the direct controlling entity of the other Defendants named in this action, including SAH, SAHS, SAPRA, PT Works, and the SAF, and guides and oversees the activities of all Sheltering Arms entities.

21. Defendant **Timothy M. Silver, M.D.**, is a Virginia resident.   Dr. Silver has been employed by a Sheltering Arms entity since 2005.  Dr. Silver has been named a "Medical Director" of Sheltering Arms Hospital - South since at least 2009.  Dr. Silver was paid a separate Medical Director salary in addition to his base salary and incentive compensation for his clinical care services under a physician employment agreement.  Dr. Silver works primarily at the SAHS / Midlothian campus, specializing in inpatient and outpatient rehabilitative care, and generates referrals of patients for outpatient therapy care at the various Sheltering Arms therapy locations.

22. Defendant **Hillary S. Hawkins, M.D.**, is a Virginia resident.   Dr. Hawkins has been employed by a Sheltering Arms entity since 1993.  Dr. Hawkins has been named a "Medical Director" of Sheltering Arms Hospital (Hanover) since 2009.  Dr. Hawkins was paid a separate Medical Director salary in addition to her base salary and incentive compensation for her clinical care services under a physician employment agreement. Dr. Hawkins works primarily at the SAH campus, specializing in inpatient and outpatient

rehabilitative care, and generates referrals of patients for outpatient therapy care at the various Sheltering Arms therapy locations.

23. Defendant **Gregory F. Leghart, M.D.,** is a Virginia resident. Dr. Leghart has been employed by a Sheltering Arms entity since 1993. Dr. Leghart was a named "Medical Director" for at least four different Sheltering Arms rehabilitative care programs (Functional Restoration/Back to Work Program, Brain Injury Program, Spasticity Program, and Stroke Rehabilitation Program). Dr. Leghart was paid Medical Director salaries in addition to his base salary and incentive compensation for his clinical care services under a physician employment agreement. In addition, SAPRA also paid Dr. Leghart for serving as the "Physician Champion" of the Sheltering Arms EMR (electronic medical record) conversion team. Dr. Leghart works primarily at the Sheltering Arms Hospital, specializing in neurological and musculoskeletal/soft tissue disorders and inpatient and outpatient rehabilitative care, and generates referrals of patients for outpatient therapy care at the various Sheltering Arms therapy locations.

24. Defendant **Albert M. Jones, M.D.,** is a Virginia resident. Dr. Albert Jones has been employed by a Sheltering Arms entity since 1988. Dr. Albert Jones was a named "Medical Director" of a Sheltering Arms entity for approximately 17 years. Dr. Albert Jones was paid a separate Medical Director salary in addition to his compensation for his clinical care services under a physician employment agreement. In addition, Dr. Albert Jones served as a Medical Director of a discontinued Sheltering Arms program known as "Day Rehab," for which work he was also compensated. Dr. Albert Jones has continued to be paid Medical Director salary for years after his nominal responsibilities for Day Rehab role, and the program itself, ended. Dr. Albert Jones works primarily at the Bon

Air Center and Reynolds Center, specializing in adult neurological disorders and inpatient and outpatient rehabilitative care, and generates referrals of patients for outpatient therapy care at the various Sheltering Arms therapy locations.

## REGULATORY BACKGROUND

### I.  Medicare and Medicaid

25.  Medicare is a federally-funded health insurance program which provides for certain medical expenses for persons who are over 65, who are disabled, or who suffer from End Stage Renal Disease.

26.  The Medicare Program has four parts: Part A, Part B, Part C and Part D. Medicare Part A, the Basic Plan of Hospital Insurance, covers the cost of inpatient hospital services and post-hospital nursing facility care. Medicare Part B, the Voluntary Supplemental Insurance Plan, covers the cost of services performed by physicians and certain other health care providers, both inpatient and outpatient, if the services are medically necessary and directly and personally provided by the provider. Medicare Part C covers certain managed care plans, and Medicare Part D provides subsidized prescription drug coverage for Medicare beneficiaries.

27.  The Medicare program is administered through the Department of Health and Human Services, Centers for Medicare and Medicaid Services ("CMS").

28.  Medicare coverage is limited to those items and services which are reasonable and medically necessary. 42 U.S.C. § 1395y(a)(1). Health care practitioners and providers are required to ensure that all services are "provided economically and only when, and to the extent, medically necessary." 42 U.S.C. § 1320c-5(a)(1),(3). Providers who furnish

services or items substantially in excess of the needs of their patients may be excluded from participation in federal health care programs altogether. 42 U.S.C. § 1320a-7(b)(6).

29. Under the "traditional" Medicare program (Parts A and B), CMS makes payments retrospectively (after the services are rendered) to hospitals for inpatient and outpatient services. Under Part B, Medicare will generally pay 80 percent of the "reasonable" charge for medically necessary items and services provided to beneficiaries. See 42 U.S.C. §§ 1395l(a)(1), 1395y(a)(1). For most services, the reasonable charge has been defined as the lowest of (a) the actual billed charge, (b) the provider's customary charge, or (c) the prevailing charge for the service in the locality. See 42 C.F.R. §§ 405.502-504.

30. Medicare Part B is a voluntary subsidized insurance program covering, *inter alia*, physicians' services, certain outpatient hospital care, and laboratory services. Part B's benefits are paid from the federal Supplemental Medical Insurance Trust Fund, which is financed by individual premiums and general federal tax revenues.

31. Medicare Part B pays for "medical and other health care services" provided by a physician or other designated and properly credentialed provider, subject to specific exclusions. See 42 C.F.R. § 424.24.

32. In order to bill Medicare Part B, a provider must submit a claim form called the CMS 1500. The provider certifies on the claim form to the truthfulness of the claim and signs a provider agreement agreeing to comply with all Medicare requirements including the fraud, waste, and abuse provisions. A provider who fails to comply with these statutes and regulations, including the Stark Law and Anti-Kickback Statute, is not entitled to payment for services rendered to Medicare patients.

33. Medicaid is a public-assistance program created in 1965 that provides payment of medical expenses for low-income and disabled patients. Funding for Medicaid is shared between the federal government and those states participating in the program. Medicaid is the largest source of funding for medical services for America's poor and disabled. Each provider that participates in the Medicaid program must sign a provider agreement with his or her state.

34. Federal regulations require each state to designate a single state agency responsible for the Medicaid program. The agency must create and implement a "plan for medical assistance" that is consistent with Title XIX of the Social Security Act and with the regulations the Secretary of HHS promulgates. Although Medicaid is administered on a state-by-state basis, the state programs adhere to federal guidelines. Federal statutes and regulations restrict the items and services for which the federal government will pay through its funding of state Medicaid programs.

35. The amount of federal financial participation (FFP) (also referred to as Federal Medical Assistance Percentages) in Medicaid spending by each state is calculated each fiscal year in accordance with a formula established under Title XIX, with federal portion ranging from a low of 50% in federal funding to more than 75%, depending on a variety of factors including such things as the relative wealth of the State and its people and the total amount and kinds of expected Medicaid expenditures that are needed or expected.

36. Each state Medicaid program must cover hospital services, 42 U.S.C.§ 1396a(1)(A), 42 U.S.C. § 1396d(A)(1)-(2), and each program uses a cost reporting method similar to that used under Medicare.

37. Each provider participating in the Medicaid program must sign a Medicaid provider agreement with that state. Although there are variations in the agreements among the states, all states require the prospective Medicaid provider to agree to comply with all Federal and State Medicaid requirements, including the fraud, waste, and abuse provisions and the Stark Law and Anti-Kickback Statute. A provider who fails to comply with these statutes and regulations is not entitled to payment for services rendered to Medicaid patients

## II.    The Federal Anti-Kickback Statute

38. The Anti-Kickback Statute ("AKS") (42 U.S.C. § 1320a-7b(b)) prohibits the knowing and willful payment of remuneration to induce patient referrals, to reward for patient referrals, or to otherwise generate business involving items or services payable by Federal health care programs, including Medicare, Medicaid, TRICARE, CHAMPVA, and other Federally-funded health care programs.   In short, paying or rewarding a physician for referrals – or accepting that remuneration - is a crime.

39. Healthcare kickbacks are illegal because they can lead to increased costs, unnecessary care and treatments, and corrupt medical decision-making.   It its guide for new physicians, "A Roadmap for New Physicians: Avoiding Medicare and Medicaid Fraud and Abuse," the Office of Inspector General of the Department of Health and Human Services specifically recognized the essence of the quid pro quo of healthcare kickbacks:

> "As a physician, you are an attractive target for kickback schemes because you can be a source of referrals for fellow physicians or other health care providers and suppliers.  You decide what drugs your patients use, which specialists they see, and what health care services and supplies they receive."

> https://oig.hhs.gov/compliance/physician-education/roadmap_web_version.pdf

40. The AKS specifically provides that claims arising from the giving or receiving of illegal remuneration are false or fraudulent claims for purposes of the Federal False Claims Act. 41 U.S.C. § 1320a-7b(g).

41. The AKS is violated when one purpose of the payment or remuneration is to induce or reward referrals of services to be paid by Federal health care programs.

42. A violation of the AKS can occur even if services were actually rendered and medically necessary.

43. A personal service or management contract is no shield against an AKS violation (i) if the relationship is not set out in writing (ii) if the compensation is not consistent with fair market value in arms-length transactions, and (iii) if the total compensation takes into account the volume or value of any referrals generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid, or other Federal health care programs. 42 CFR §1001.952(d).

44. Similarly, an employment relationship between the parties will not protect conduct violative of the AKS when remuneration offered and received does not arise from a *bona fide* employment relationship. 42 CFR §1001.952(i).

45. As alleged in further detail below, Defendants' conduct does not and did not satisfy any AKS safe harbor.

### III. The Stark Law

46. The Physician Self-Referral Law ("Stark Law"), 42 U.S.C. § 1395nn, bars physicians from referring patients to receive certain "designated health services" ("DHS") payable by Medicare and Medicaid from entities with which the physician has a financial relationship.

47. Pursuant to the Stark Law, it is illegal for anyone to receive Federal payments for DHS performed as a result of an improper referral. The plain purpose of the strict-liability Stark Law is to prevent physicians from profiting from their own referrals.

48. Physical therapy, occupational therapy, and outpatient speech-language pathology services are "designated health services," as defined by the Stark Law. 42 U.S.C. § 1395nn(h)(6); 42 CFR 411.351.

49. Physical therapy services are defined by the Stark Law regulations as, "outpatient physical therapy services [including] (i) assessments, function tests, and measurements of strength, balance, endurance, range of motion, and activities of daily living; (ii) therapeutic exercises, massage, and use of physical medicine modalities, assistive devices, and adaptive equipment, or (iii) establishment of a maintenance therapy program for an individual whose restoration potential has been reached."

50. Occupational therapy services are defined by the Stark Law regulations as including, "(i) teaching of compensatory techniques to permit an individual with a physical or cognitive impairment or limitation to engage in daily activities, (ii) evaluation of an individual's level of independent functioning, (iii) selection and teaching of task-oriented therapeutic activities to restore sensory-integrative function; or (iv) assessment of an individual's vocational potential, except when the assessment is related solely to vocational rehabilitation."

51. Speech-language pathology services are defined by the Stark Law regulations to include outpatient "diagnosis and treatment of speech, language, and cognitive disorders that include swallowing and other oral-motor dysfunctions."

52. The Stark Law regulations define "referral" to mean, "the request by a physician for, or ordering of, or the certifying or recertifying the need for, any designated health service for which payment may be made under Medicare Part B . . ." 42 CFR 411.351.  While services personally performed by the referring physician cannot be a prohibited "referral", services provided by the physician's employees, independent contractors, or group practice members are referrals within the ambit of the Stark Law prohibitions.  Id.

53. Stark Law regulations define "referring physician" to mean "a physician who makes a referral as defined in this section or who directs another person or entity to make a referral or who controls referrals made to another person or entity."

54. The Stark Law prohibits an entity from presenting (or causing to be presented) any claim resulting from a referral from a physician who has a financial relationship with that entity. 42 CFR § 411.353.

55. A financial relationship subject to the Stark Law regulations includes a direct compensation arrangement involving remuneration. 42 CFR § 411.354(a)-(c). While the Stark Law permits referrals for remuneration in limited circumstances, the law still requires that any remuneration be consistent with (i) fair market value, (ii) for services performed and (iii) that the compensation arrangement meet all elements of a specific enumerated exception. 42 CFR § 411.354(d)(4).

56. A physician working for an entity as a "medical director" would be deemed to have a financial relationship with that entity under Stark.

57. Potentially relevant exceptions to Stark Law liability for medical director compensation arrangements would include the "bona fide employment relationships" exception and the "personal services arrangements" exception. 42 CFR § 411.357(c-d).

58.    To satisfy the bona fide employment relationships exception to Stark, the financial relationship must meet the following conditions, *inter alia*:

- The employment is for identifiable services;

- The amount of remuneration under the employment is consistent with the fair market value of the services, and is not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician;

- The remuneration is provided under an arrangement that would be commercially reasonable even if no referrals were made to the employer;

42 CFR § 411.354(c).

59.    To satisfy the personal services arrangements exception to Stark Law, the financial relationship must meet the following conditions, *inter alia*:

- Each arrangement (i) must be set out in writing, (ii) must be signed by the parties, and (ii) must specify the services covered by the arrangement;

- The aggregate services covered by the arrangement do not exceed those that are reasonable and necessary for the legitimate business purposes of the arrangement;

- The duration of each agreement it as least 1 year . . . if an arrangement is terminated with or without cause, the parties may not enter into the same or substantially the same arrangement during the first year of the original agreement;

- The compensation to be paid over the term of each agreement (i) is set in advance, (ii) does not exceed fair market value, (iii) and is not determined in a manner that takes into account the volume or value of any referrals or other business generated between the parties;

- The services to be furnished under each arrangement do not involve any activity that violates any Federal or State law;

60. Pursuant to the Affordable Care Act of 2010, any claim submitted to a Federal health care program that includes items or services resulting from violations of the AKS constitutes a false or fraudulent claim for purposes of the False Claims Act. 42 U.S.C. § 1320a-7b(g).

61. Outpatient occupational therapy services, outpatient physical therapy services, outpatient speech-language pathology services, and outpatient psychological services may only be billed to Medicare Part B if certain conditions are met. Medicare will only reimburse for these services if "they are furnished to a beneficiary while he or she is under the care of a physician who is a doctor of medicine, osteopathy, or podiatric medicine." 42 CFR § 410.59(a)(1), 42 CFR § 410.60(a)(1), 42 CFR § 410.62 (a)(1).

## FACTS

### I.     Physiatry and Outpatient Therapy Referrals

62. Defendants have engaged in a scheme to pay and reward referring physicians with sham "Medical Director" (or similar EMR) positions or other remuneration in exchange for referrals of outpatient therapy services to be paid by Medicare, Medicaid, TRICARE, CHAMPVA, FEHB, and other Federally-funded programs.[2]

63. Defendants are all part of a hospital and outpatient and health care practice commonly known as "Sheltering Arms Physical Rehabilitation Centers" located in the greater Richmond, Virginia area. Defendants, and those working for them, currently provide physical medicine and rehabilitation care and treatment to patients on an inpatient and outpatient basis at ten locations in and around Richmond, Virginia.

---

[2] Defendants used the terms "Medical Director" and "Co-Chief Medical Officer" to describe the same duties and obligations.

64. Rehabilitation, including physical therapy, occupational therapy, speech-language pathology, and medical psychology and counseling can be required after illness, injury, or accident. Conditions treated can arise from a variety of circumstances, including, for example, a sports injury, stroke, or a catastrophic accident. In many cases, a doctor specializing in physical medicine and rehabilitation, known as a physiatrist, will oversee a patient's care and treatment.

65. Initial rehabilitative care can include an inpatient stay at a rehabilitation hospital like The Sheltering Arms Hospital or The Sheltering Arms Hospital South.

66. Physiatrists overseeing inpatient rehabilitative care at The Sheltering Arms Hospital and The Sheltering Arms Hospital South are responsible for serving as the attending physician, performing consultations, completing multiple daily rounds, overseeing admissions, overseeing discharges, conducting patient office visits, and overseeing a minimum of three hours of inpatient rehabilitation for each hospital patient each day.

67. Each Sheltering Arms physiatrist is also responsible for periods of being on-call. In addition, pursuant to each physician employment agreement with Sheltering Arms Physical Rehabilitation Associates LLC, each physiatrist is responsible for additional non-clinical duties like training, networking, meetings, and committee responsibilities.

68. In almost all cases, at the conclusion of an inpatient stay at The Sheltering Arms Hospital or The Sheltering Arms Hospital South, a physiatrist overseeing such inpatient care will determine that various outpatient rehabilitative treatments are necessary and will further refer a patient to the care of a trained and licensed physical therapist, occupational therapist, speech pathologist, medical psychologist or other specialist.

69.  Sheltering Arms patients receive outpatient physician clinic care in one (1) of four (4) physicians' outpatient clinic locations, and/or outpatient physical therapy care in any of the ten (10) outpatient physical therapy office locations, as discussed below.

70.  SAPRA physiatrists are a primary source of patient referrals to outpatient therapy services provided by therapists working for the Sheltering Arms Hospital at various Sheltering Arms Physical Rehabilitation Centers.

71.  Referrals from SAPRA physicians are an important factor in maintaining a successful rehabilitation and therapy business.  The greater Richmond, Virginia area where the Defendants' Sheltering Arms centers are located offers dozens of competing physical therapy, occupational therapy, and speech-language pathology establishments, including several entities that also offer services at multiple locations.

72.  Defendants' outpatient therapy practice is substantial.  For 2018, Defendants provided a reported 142,923 outpatient procedures, an all-time high. Defendants' reporting of previous years' outpatient visit volume also shows growth over time, as Defendants have reported between 118,000 to 132,000 outpatient visits every year since 2010.

## II.  SHELTERING ARMS PHYSICAL REHABILITATION CENTERS LOCATIONS

73.  In addition to the SAH and SAHS, the Sheltering Arms Defendants currently operate eight additional brick-and-mortar "Sheltering Arms Physical Rehabilitation Centers" locations where patients receive a variety of rehabilitative care that Defendants seek to have reimbursed by Medicare, Medicaid, TRICARE, CHAMPVA, FEHB, and other Federally-funded government healthcare programs.

74. Since at least 2009, the Defendants have operated The Hanover Rehabilitation Center located at 8226, Meadowbridge Road, Mechanicsville, VA 23116, part of the same campus as SAH. This location offers a variety of rehabilitative care provided by therapists and professionals employed by SAH, including outpatient therapy services sought to be reimbursed by Medicare, Medicaid, TRICARE, CHAMPVA, FEHB, and other Federally-funded government healthcare programs.

75. Defendants operate the Bon Air Center, located at 206 Twinridge Lane, Richmond, VA 23235. This location offers a variety of rehabilitative care provided by therapists and professionals employed by SAH, including outpatient therapy services sought to be reimbursed by Medicare, Medicaid, TRICARE, CHAMPVA, FEHB, and other Federally-funded government healthcare programs. For a period of time, the Bon Air Center also offered a rehabilitative care program known as "Day Rehab."

76. Since at least 2009, the Defendants have operated the Chester Center, located at 1220 Iron Bridge Road, Suite C, Chester, VA 23831. This location offers a variety of rehabilitative care provided by therapists and professionals employed by SAH, including outpatient therapy services sought to be reimbursed by Medicare, Medicaid, TRICARE, CHAMPVA, FEHB, and other Federally-funded government healthcare programs.

77. Since at least 2009, the Defendants have operated the Midtown Center, located at 2805 West Broad Street, Richmond, VA 23230. This location offers a variety of rehabilitative care provided by therapists and professionals employed by SAH, including outpatient therapy services sought to be reimbursed by Medicare, Medicaid, TRICARE, CHAMPVA, FEHB, and other Federally-funded government healthcare programs.

78.  Since at least 2009, the Defendants have operated the Laburnum Center, located at 4730 S. Laburnum Avenue, Richmond, VA, 23231.   This location offers a variety of rehabilitative care provided by therapists and professionals employed by SAH, including outpatient therapy services sought to be reimbursed by Medicare, Medicaid, TRICARE, CHAMPVA, FEHB, and other Federally-funded government healthcare programs.

79.  Since 2010, the Defendants have operated the Hull Street Center, located at 13530 Hull Street Road, Midlothian, VA 23114.  This location offers a variety of rehabilitative care provided by therapists and professionals employed by SAH, including outpatient therpay services sought to be reimbursed by Medicare, Medicaid, TRICARE, CHAMPVA, FEHB, and other Federally-funded government healthcare programs.

80.  Since 2010, the Defendants have operated the West End Center, also known as PT Works, located at 2296 John Rolfe Parkway, Henrico, VA 23233. This location offers a variety of rehabilitative care provided by therapists and professionals employed by SAH, including outpatient therapy services sought to be reimbursed by Medicare, Medicaid, TRICARE, CHAMPVA, FEHB, and other Federally-funded government healthcare programs.

81.  Since 2014 the Defendants have operated the Reynolds Center, located at 6627 W. Broad Street, Richmond, VA, 23230.   This location offers a variety of rehabilitative care provided by therapists and professionals employed by SAH, including outpatient therapy services sought to be reimbursed by Medicare, Medicaid, TRICARE, CHAMPVA, FEHB, and other Federally-funded government healthcare programs.

82.  In addition to these current, active locations, from at least 2009 through 2012, Defendants also previously operated the Maple Center, also known as the St. Mary's Campus.  And until 2009, Defendants operated the East Shore Center.  Both the Maple and East Shore

locations offered rehabilitative care provided by therapists and professionals employed by SAH, including outpatient therapy services sought to be reimbursed by Medicare, Medicaid, TRICARE, CHAMPVA, FEHB, and other Federally-funded government healthcare programs.

## III.    THE DEFENDANTS' FRAUDULENT SCHEME

83.   As detailed below, Defendants have submitted or caused to be submitted false claims for payment or approval to Medicare, Medicaid, TRICARE, CHAMPVA, FEHB, and other Federally-funded government healthcare programs for rehabilitative patient care arising out of illegal financial relationships, including relationships and conduct that violate Federal and Virginia false claims, self-referral, and anti-kickback laws.

84.   Specifically, Defendants have paid and received remuneration in excess of fair market value to induce and reward referrals of patients receiving rehabilitative care paid for by Medicare, Medicaid, TRICARE, CHAMPVA, FEHB, and other Federally-funded programs, resulting in the submission of false claims for payment or approval to the United States and the Commonwealth of Virginia.

85.   Defendants induced and rewarded and intended to induce and reward health care referrals by (1) creating highly lucrative, but sham "Co-Chief Medical Officer and Medical Director" positions for their two top referring doctors, by (2) overcompensating a third physician for non-clinical and administrative duties that were not performed, and by (3) continuing to pay a fourth physician as a "Medical Director," for a Sheltering Arms program that had long ceased to exist.

86.   In all cases, Defendants knew that the full extent of the required Co-Chief Medical Officer and Medical Director or other non-clinical duties, specifically a minimum of 20

(twenty) hours a week, or otherwise specified as "50% of Physician's full time work hours," was not performed as required and nominally contracted-to by the Defendants. In the case of the Medical Directorship for a defunct program, Defendants knew not only that such work was not performed, but that it could not possibly have been be performed.

87. Defendants also knew that in all cases, the work for which the extra payments were made was not fully and properly tracked, recorded, or logged as required by contract.

88. Regardless, paying for work that is not or cannot be performed can never be commercially reasonable and that compensation arising from such a relationship can never be at fair market value. Similarly, contract language unilaterally declaring salary to be "fair market value," does not, *ipse dixit*, make it so.

89. Further, because the minimum 20 hours a week of specific, and enumerated Co-Chief Medical Officer and Medical Director (or similar EMR) duties was not performed, the decision to create those positions and pay those salaries was never commercially reasonable in the first instance.

90. It is simply illogical to have elaborated so significantly on the various substantive requirements of these administrative positions while neither tracking the required time expended on them nor halting payments for them upon learning the duties were substantially unperformed.

91. For example, from 2017 to 2018, Defendant Hillary S. Hawkins, M.D., received a base salary of $190,000 pursuant to her physician employment agreement with Sheltering Arms Physical Rehabilitation Associates LLC, and a concurrent salary of $149,325 for serving as a Co-Chief Medical Officer and Medical Director for The Sheltering Arms Hospital, a separate and discrete legal entity.

92. From 2017 to 2018, Defendant Timothy M. Silver, M.D., received a base salary of $190,000 pursuant to his physician employment agreement from Sheltering Arms Physical Rehabilitation Associates LLC, and a concurrent salary of $144,282 for serving as a Medical Director for The Sheltering Arms Hospital South, a separate and discrete legal entity.

93. In both cases, even if Dr. Hawkins and Dr. Silver had performed the required minimum of twenty hours a week of Co-Chief Medical Officer and Medical Director duties, which they did not, their total compensation exceeded fair market value compensation.

94. Through his work and responsibility for the day to day management of Sheltering Arms' Physician and Psychology Services, Relator knew that Defendants considered Dr. Hawkins, Dr. Silver, and Dr. Leghart to be the most important physician referral sources of outpatient rehabilitation patients to Sheltering Arms outpatient therapy locations.

95. Relator estimates that Dr. Hawkins, Dr. Silver, and Dr. Leghart's referrals accounted for approximately 75% of Sheltering Arms' outpatient therapy referral business. Because of their importance to the business, Sheltering Arms administrators referred to these doctors as, "the big three."

96. Defendants' administrators, including President and CEO Mary Zweifel and COO Amy Showalter, made repeated, specific comments to Relator expressing dissatisfaction that certain other Sheltering Arms physicians were "underproducing," referrals while the Sheltering Arms doctors that produced higher volumes of referrals, specifically, Dr. Silver, Dr. Hawkins, and Dr. Leghart, needed to be "kept happy" "at all costs."

97. These physicians were kept happy by the continued payment of their enhanced or additional salaries even when it resulted in repeatedly being paid for work that was not fully performed.

98. The salaries and payments related to the medical directorships and the salary and payments for other administrative work were remuneration intended to induce and reward referrals of outpatient therapy procedures.

99. Outpatient therapy referrals often arise as a matter of course from the provision of inpatient medical care in a clinical setting. It is necessarily the case that administrative duties, like medical directorship or similar duties, cannot result in referrals because no patients are seen in a clinical setting while those duties are performed.

100. As alleged in detail below, Sheltering Arms doctors, including Dr. Hawkins, Dr. Silver, Dr. Leghart, and Dr. Albert Jones referred their patients for outpatient therapy services to facilities owned and operated by SAH, SAHS, and SAC.

101. Despite their additional paid duties, Dr. Hawkins, Dr. Silver, Dr. Leghart, and Dr. Albert Jones were all required, pursuant to their respective physician employment agreements with SAPRA, to work "full time," providing clinical services to patients. Their work schedules, discussed in greater detail below, were consistent with their full-time clinical requirements: each doctor was scheduled to work 40-hour weeks performing clinical care at their respective Sheltering Arms locations.

102. Clinical patient care and non-clinical or administrative work cannot be performed concurrently.

103. As a result, it was logically, temporally, and physically impossible for Drs. Silver and Hawkins, in addition to their busy clinical work and schedules (not including their

various other professional and educational commitments), to also perform the required minimum of 20 hours a week of detailed and expansive Co-Chief Medical Officer and Medical Director services to their respective hospitals.

104. Similarly, it was logically, temporally, and physically impossible for Dr. Leghart to divert a full "50%" of his "full time work hours," to an electronic medical records conversion project when he was consistently scheduled to work full time shifts of clinical care duty pursuant to his physician employment agreement with SAPRA.

105. As a further example of Defendants' explicit embrace of the sham nature of its "medical director" contracts, Defendants knowingly and willfully compensated Dr. Albert Jones for serving as a "Medical Director" of a specialty program ("Day Rehab") that had ceased to exist.  Relator repeatedly voiced concerns about the arrangement to CEO and President, Mary Zweifel and COO Amy Showalter, among others, who nonetheless continued the payments for the sham position.

106. In contrast, Defendants and their executive leadership also repeatedly complained that other SAPRA doctors in their practice – the ones without medical directorships or otherwise enhanced salaries - needed to generate more revenue (which would have necessarily included outpatient therapy referrals).  During his tenure, Relator participated in numerous meetings with Mary Zweifel and Amy Showalter where this topic was discussed repeatedly.

107. Based upon the amount paid to Dr. Silver and Dr. Hawkins as Medical Directors in 2017 and 2018, in the last ten years Defendants have paid and received in excess of approximately $3,000,000 for medical directorship (or similar EMR) positions when the

contractually-required minimum hours were not worked and when the payments were for directorship of programs that did not exist.

108. As discussed in detail below, the superficially detailed and specific duties in the Co-Chief Medical Officer and Medical Director agreements and the EMR Physician Champion agreement were created to give the impression that the titles stood for real positions of equally real substance.

109. In the same way, the multiple typographical and formatting errors and the overly generalized and occasionally redundant requirements in those agreements are consistent with the hasty and careless drafting of documents that the drafter and signatories knew would be primarily for show – especially when Defendants knew that time records tracking these activities were never kept.

110. The same general standards of draftsmanship and detail were exhibited in the either ineffective or inaccurate contract extensions discussed herein.

111. A primary purpose of the Medical Director and EMR Physician Champion positions was to generate and reward certain SAPRA doctors who were the most valuable sources of revenue production and outpatient therapy referrals to the Sheltering Arms Physical Rehabilitation Centers.

112. More than half of Sheltering Arms' patient population were and are beneficiaries of Medicare, Medicaid, TRICARE, CHAMPVA, FEHB, and other Federally-funded healthcare programs.

113. During the last ten years SAPRA physicians have referred and Sheltering Arms Physical Therapy Centers have performed upwards of one million (1,000,000) outpatient therapy sessions.

114. In approximately 2017-2018, 60% of Sheltering Arms' services were provided to Medicare beneficiaries.  Approximately 3% of Sheltering Arms' services were provided to Medicaid beneficiaries during this time period.

115. When making referrals of outpatient therapy care to Sheltering Arms Physical Therapy Centers, Dr. Silver and Dr. Hawkins both had direct financial relationships with SAH as paid Co-Chief Medical Officers and Medical Directors.  All four physician Defendants, Dr. Silver, Dr. Hawkins, Dr. Leghart, and Dr. Albert Jones, had direct and/or indirect financial relationships with SAH and SAF through their financial support of SAPRA.

116. As described herein, the physician Defendants referred patients to receive DHS payable by Medicare and Medicaid from entities with whom the physician Defendants had financial relationships.  As a result, the Sheltering Arms Defendants received Federal payments for DHS as a result of the improper referrals.

117. As described herein, Defendants knowingly and willfully paid and received remuneration to induce and reward patient referrals for services payable by Federal health care programs.

## IV.   SAPRA PHYSICIANS' EXPIRED CONTRACTS

118. In his capacity as Associate Vice President, Relator reported to Sheltering Arms' COO, Amy Showalter.  In addition to Ms. Showalter, Relator also worked on issues related to physician compensation with Sheltering Arms President and CEO, Mary Zweifel, CFO Jim Litsinger, and Ellen Vance, SAH's Chief Human Resources Officer, who was responsible for all SAPRA physician contracts.

119. Shortly after starting his position at Sheltering Arms in August of 2017, Relator learned that six SAPRA physician contracts had expired and that short-term extensions would also soon run.

120. Relator also learned that all SAPRA physicians were refusing to sign new contracts as a way of protesting compensation they felt was inadequate.  As a result, many contracts lapsed and extensions of existing contracts, when signed, were sometimes executed post-facto after the stated extension period had already ended.

121. When Relator left Sheltering Arms' employ in March of 2018, approximately eleven contracts for nine physicians and medical staff had expired – eight of which had first expired by September 30, 2017.

## V.     DR. TIMOTHY SILVER'S MEDICAL DIRECTORSHIP

122. Specifically, Timothy Silver's "Physician Employment Agreement" with SAPRA had an effective agreement date of January 1, 2014 and an expiration date of December 31, 2015.  Signatories to this agreement were Dr. Silver and James E. Sok, Mary Zweifel's predecessor as President and CEO on behalf of SAPRA.

123. Dr. Silver and SAPRA executed a post-expiration extension of this contract on October 20, 2016 for the period through September 30, 2016.  Similarly, Dr. Silver and SAPRA executed a further post-facto extension of the January 1, 2014 contract on October 3, 2017, extending the term through the already passed date of September 30, 2017. Signatories to these amendments were Dr. Silver and Ellen B. Vance, Sheltering Arms' Chief Human Resources Officer, on behalf of SAPRA.

124. Dr. Silver's January 1, 2014 physician employment agreement contained the following recitals:

"**Whereas,** Associates provides a full range of rehabilitation and physical medicine ("physiatry") services to patients who receive physical medicine and rehabilitation services from The Sheltering Arms Corporation (hereafter "Sheltering Arms") in its various inpatient and outpatient facilities, and at non-Sheltering Arms facilities with which Sheltering Arms has agreements wherever located (hereafter referred to collectively as "Sheltering Arms Facilities");

**Whereas,** Associates has determined that the efficient and effective delivery of physiatry services to its patients can best be achieved by employing on a full-time basis physician with training and experience in physiatry.

**Employment.** Associates hereby employs Physician to provide medical services in the specialty of physiatry to patients who receive care at Sheltering Arms Facilities. Physician hereby accepts such employment and agrees to serve in such capacity in accordance with this Agreement and any specific procedures and guidelines detailed within Sheltering Arms policies . . .

**Exclusivity.** Physician shall devote Physician's entire time, attention and energies to Sheltering Arms' business. Physician understands and agrees that throughout the Term of this Agreement Physician will be prohibited from engaging in the private practice of medicine and from providing the same or similar professional or managerial services to any other hospital or entity without advance written permission from Associates."

125. Dr. Silver's physician employment agreement also specified the full scope of his required duties, including professional clinical services, on-call coverage, admission consulting services, training of medical students, networking, administrative duties, and meetings and committees.

126. Dr. Silver's physician employment agreement also required detailed timekeeping:

"**Records of Services Provided.** Physician shall fully document, on a timely and legible basis, all services performed under this Agreement consistent with the requirements of Associates, third-party payors, and applicable regulatory agencies. This documentation shall become part of the medical record maintained by Associates or the applicable Sheltering Arms Facility. The documentation shall be sufficiently detailed to enable Associates and a third party, if applicable, to verify: (i) the services provided; (ii) the amount of time allocated for the provision of Physician's services to identifiable patients; (iii) the amount of time allocated for the provision of Physician's services to Sheltering Arms; and (jv) the amount of time allocated for community contacts, research, or other activities.

127.  Dr. Silver's physician employment agreement provided that "Associates shall pay Physician $190,000.00 per twelve (12) month period during the Term of the Agreement ("Base Pay"). Dr. Silver was also entitled a "Quality & Productivity Bonus" related to the "total amount properly coded and billed for all clinical Qualified Services."

128.  Dr. Silver's total 12-month compensation under the physician employment agreement with SAPRA was capped at $360,000.00.

129.  In addition to and separate from the physician employment agreement executed with SAPRA, Dr. Silver also signed agreements to serve as "Co-Chief Medical Officer" and "Medical Director" with SAHS. Dr. Silver served in these positions, however named, every year since at least 2009.

130.  For example, on June 30, 2015, Dr. Silver and Sheltering Arms Hospital South executed a "Co-Chief Medical Officer and Medical Director Agreement," with an effective date of July 1, 2015 and a term through June 30, 2017. The signatories to the agreement were Dr. Silver and James E. Sok, as president of Sheltering Arms Hospital.

131.  This agreement contained the following recitals:

"WHEREAS, SAHS provides a full range of rehabilitation and physical medicine services to the community in Richmond, VA and surrounding areas;

WHEREAS, many patients in need of physical medicine and rehabilitation services are referred to SAHS for such care;

WHEREAS, SAHS requires the services of a licensed and qualified physician to conduct certain administrative and supervisory duties (collectively referred to as the "Duties") as the Co-Chief Medical Officer and Medical Director of SAHS;

WHEREAS, Physician possesses appropriate credentials and wishes to be engaged by SAHS to conduct such duties at SAHS in accordance with the provisions set forth herein . . ."

132. Dr. Silver's agreement with SAHS to serve as as Co-Chief Medical Officer and Medical

Director of SAHS included the following terms:

"**Conduct of Duties**: Physician shall conduct the following duties:

    (a)    Physician shall be responsible for the duties specified further in *Exhibit A* attached hereto and incorporated herein, and such other duties as may be required by applicable law or regulation or as may be reasonably requested by the *Sheltering Arms Vice President Medical Services & Strategic Development* or the *President/CEO of Sheltering Arms*. Physician shall comply with all currently accepted and approved methods and practices applicable to the services provided hereunder.

    (b)    Physician shall carry our duties and provide associated services on a schedule to be determined mutually by Physician and the *Sheltering Arms Vice President Medical Services & Strategic Development* or the *President/CEO of Sheltering Arms*. It is understood at the outset of this Agreement that no fewer than 20 hours per week will be devoted to the SAHS inpatient programs.

**Applicable Standards**. Physician shall perform all duties and services in accordance with all applicable requirements, standards, rulings and regulations of the Joint Commission, the U.S. Department of Health and Human Services, the Virginia Department of Health and Public Welfare and any other federal, state, or local government agency or authority exercising jurisdiction over SAHS as well as all applicable SAHS policies and procedures which may be in effect and amended from time to time. Physician shall perform services in conformance with all applicable legal requirements.

**Professional Services**. SAHS acknowledges that Physician may provide professional services for patients of SAHS under an Employment Agreement with Sheltering Arms Physical Rehabilitation Associates, LLC (SAPRA). Such professional services are independent of the Services under this current Agreement. SAPRA shall bill independently for such professional services.

**No Assignment or Subcontract**. Neither this Agreement, not any of the duties and responsibilities of the Physician under this Agreement, may be assigned or subcontracted by Physician. This agreement may be assigned or subcontracted by SAHS only to another Sheltering Arms entity."

133. Exhibit A of Dr. Silver's Co-Chief Medical Officer and Medical Director of SAHS

agreement listed more than 30 specific duties and responsibilities Dr. Silver was required

to perform or manage in addition to his clinical inpatient work performed pursuant to his

physician employment agreement with SAPRA, including:

> The Co-Chief Medical Officer and Medical Director shall function as a full member of the Sheltering Arms leadership team with regard to organizational challenges, initiatives, and activities:

- Align departmental and personal goals with those of the organization
- Focus on organization-wide financial considerations while also being involved considerations (sic) related to physician productivity and compensation
- Provide leadership with regard to system changes
- Collaborate in "networking" and the development of strategic alliances relevant to referral development, program/service development, research program involvement, and responsiveness to opportunities
- Demonstrate commitment to complete discretion and confidentiality
- Promote the mission and vision of the organization

> The Co-Chief Medical Officer and Medical Director will provide leadership for the Hospital and associated clinics at all levels:

- Daily oversight of physicians to insure quality, safety, and efficiency of care
- Daily oversight with regard to utilization of resources
- Leadership regarding broad growth and improved efficiency of the Hospital inpatient operation
  - Criteria and processes regarding referrals & admissions
  - Length of stay management
  - Documentation management
  - Neurorehabilitation services
- Growth and improved efficiency of outpatient services
  - Interventional pain medicine
  - EMG services
  - Industrial rehab services
  - Spasticity continuum and related neurorehab initiatives
  - Other new program and service proposals
- Collaboration in recruitment and development of physicians
- Leading initiatives producing gains in surveyed patient satisfaction

> The Co-Chief Medical Officer and Medical Director will provide leadership for the Hospital with regard to Compliance, at all levels:

- Monitor and lead revision of physician documentation formats and templates to insure meeting the standards or NGS, CMS, TJC and other regulatory entities

- Collaborate with regard to preparation for NGS, RAC and other audit processes
- Provide oversight with regard to coding guidelines
- Provide leadership to insure ongoing compliance with regard to institutional policies, procedures and priorities related to safety, quality, efficiency and utilization

The Co-Chief Medical Officer and Medical Director will participate and demonstrate leadership with regard to standard organizational meetings and committees (in addition to those requiring all physicians):

- Meetings of the Board of Directors – up to 10 per year
- Quarterly Performance Improvement Steering Committee (PISC) meetings
- Quarterly Environment of Care meetings
- President's Council meetings
- Ad Hoc Planning meetings and Retreats
- Consistent meetings with the *Sheltering Arms Vice President Medical Services & Strategic Development* or the *President/CEO of Sheltering Arms,* with focus areas to include the following:
  o Hospital administrative challenges and solutions
  o Significant or recurrent variances in medical care
  o Status of relationships with Hospital case managers and admissions coordinators
  o Status of relationships with other members of the rehabilitation teams
  o Quality of care considerations
  o Practice of evidence-based I (sic) best practice medicine
  o Clinical competence
  o Opportunities for improvement in patient care quality, safety, and/or efficiency
  o Adherence to CMS, NGS, TJC standards
  o Adherence to Sheltering Arms policies and procedures
  o Professional behavior
  o Timely completion of medical records

The Co-Chief Medical Officer and Medical Director will perform such other duties as may be reasonably requested by Sheltering Arms from time to time.

134. Dr. Silver's compensation for the Co-Chief Medical Officer and Medical Director duties required SAHS to pay him, as memorialized by his contract, "$144,282 annually for each twelve month term of the Agreement . . . Such compensation amounts are fair market value for the services to be rendered."

135. The Co-Chief Medical Officer and Medical Director agreement also provided for two additional bonus opportunities for Dr. Silver: (1) Dr. Silver "may be eligible for specified performance incentive payments, as available to the Sheltering Arms senior management team" and (2) "In addition to compensation as detailed above, Physician`shall be eligible for an annual bonus based on performance related to specific criteria pertaining to administrative duties.   The annual potential bonus may change from time to time (currently the bonus potential is up to 30% of [$144,282].)"

136. According to publicly-available documents, Sheltering Arms Hospital reported Dr. Silver's 2014 base compensation as $343,249 and reported an additional $55,919 in bonus and incentive compensation for a total of $399,168.  For 2015, Sheltering Arms Hospital reported Dr. Silver's total compensation as $405,524.

137. Dr. Silver attempted to amend and extend his July 1, 2015 Co-Chief Medical Officer and Medical Director agreement after it expired, executing an extension amendment on July 6, 2017 for the period through September 30, 2017.   In attempting to execute these changes, Ellen Vance confused and conflated the Medical Director agreement with the Physician Employment agreement, citing to the wrong paragraph of the Physician agreement to amend the term of the Medical Director agreement.

138. Specifically, the proposed extension indicated an amendment to "paragraph 4.1," of the Co-Chief Medical Officer and Medical Director employment agreement.  Paragraph 4.1 is the "Term" paragraph of the Medical Director agreement.   The proposed amended text, however, reads, "2. Term."  Paragraph 2 is the "Term" paragraph of Dr. Silver's Physician Employment Agreement with SAPRA and not the Medical Director agreement.

139. Instead of executing this extension with SAH or SAHS, for whom he was supposed to be providing the indicated Co-Chief Medical Officer and Medical Director services, Dr. Silver executed this extension with *SAPRA*. Signatories to the amendment were Dr. Silver and Ellen B. Vance, Sheltering Arms' Chief Human Resources Officer, for "Employer, Sheltering Arms Physical Rehabilitation Associates, LLC". No one signed the amendment to the Co-Chief Medical Officer and Medical Director agreement on behalf of SAHS, the supposed actual employer of Dr. Silver's "Medical Director" services.

140. Because SAHS and SAPRA are separate legal entities and because of the delineated, non-overlapping contractual requirements of the physician employment agreement and the separate Medical Director agreement, the extension should have been executed between Dr. Silver and SAH, as originally drafted.

141. Regardless of the validity of this amendment and extension through September 30, 2017, Relator was unaware of any further extension of Dr. Silver's Co-Chief Medical Officer and Medial Director agreement with SAHS through the end of Relator's tenure at SAPRA in March of 2018.

142. Relator was directly responsible for monitoring the day to day operations of the Sheltering Arms Physician and Psychology practices. Specifically, Relator was responsible for the management of SAPRA and the SAPRA physicians, including Dr. Silver, who reported to the SAH President and CEO.

143. Relator had direct knowledge of all relevant aspects of physician performance and compensation. Relator knew that Dr. Silver was scheduled to work full-time, 40-hour work weeks as a SAPRA physician providing clinical patient care.

144. When SAPRA physicians were not required to work clinical shifts, the work schedule literally indicated those doctors were "Away." "Away" status was further indicated as an "H" for holiday, an "F" for a "flex" day (vacation or sick day), or an "A" for an "Alternative" day (taken off in exchange for covering an on-call week-end).

145. As a matter of regular practice, SAPRA physicians did not come in to Sheltering Arms facilities on "Away" days.

146. In dereliction of his contractual obligation to keep detailed records of his time and services for both SAPRA and non-SAPRA work, Dr. Silver did not keep detailed time records of his SAPRA and non-SAPRA work.

147. Had any records been kept, they would have shown (1) that Dr. Silver worked as a full-time SAPRA physician providing clinical care to patients and, (2) that Dr. Silver did not perform a minimum of twenty hours a week performing his contractually required duties as Co-Chief Medical Officer and Medical Director for SAHS.

148. Sheltering Arms administrators create spreadsheets in order to track and summarize contract and salary data for each SAPRA physician. Included in this data were date of hire, relevant contract dates, including expiration dates, licensure information, pay-period hours (for a two-week period), pay rate, salary, and bonus information.

149. For the 2017-2018 timeframe for example, Dr. Silver's pay-period time, indicted as "PP Hours," shows "40" for a two-week period for his work as a "physician." Dr. Silver's pay-period time for his non-physician work, indicated as "Director Medical Director," similarly shows "40" for a two-week period. Together, these entries are meant to indicate that Dr. Silver spent 20 hours of a 40-hour week working as a clinician seeing patients

and directly overseeing patient care, while spending the other half of his time working his myriad duties as Co-Chief Medical Officer and Medical Director for SAHS.

150. The information relating to Dr. Silver's "PP Hours" is false.

151. Dr. Silver did not spend half of a 40-hour work week on his duties as Co-Chief Medical Officer and Medical Director duties for SAHS.  Instead, as scheduled by Sheltering Arms, Dr. Silver worked a full, 40-hour a week schedule providing clinical care to patients.

152. Further, Dr. Silver's SAPRA physician employment agreement also required him to perform some non-clinical, administrative duties from time-to-time.  To the extent Dr. Silver provided such services, they could not count towards his 20-hour weekly minimum of Medical Director duties by the plain terms of the Medical Director agreement:

> Professional Services.  SAHS acknowledges that Physician may provide professional services for patients of SAHS under an Employment Agreement with Sheltering Arms Physical Rehabilitation Associates, LLC (SAPRA).  Such professional services are independent of the Services under this current Agreement.  SAPRA shall bill independently for such professional services.

153. The time split reflected in the Sheltering Arms spreadsheet for Dr. Silver is a fiction, created to support the false idea that Dr. Silver sacrificed half of his clinical patient time to administrative Medical Director duties.

154. Dr. Silver regularly earned productivity-based incentive compensation bonuses tied to the volume of his relative value units ("RVU"s) and related performance metrics.  Dr. Silver would not have been able to earn any such bonuses if he only spent half of his time a week with patients. All of Dr. Silver's RVU and other performance bonus goals – set by Sheltering Arms administrators - were based on the full-time clinical work schedule he actually performed.

155. Sheltering Arms administrators, including the CEO and President, COO, CFO, and Chief Human Resources Officer, all knew that Dr. Silver did not work the required minimum time as Medical Director. In addition, those same individuals all knew that Dr. Silver did not keep the required records to show how all of Dr. Silver's time was spent.

156. Relator was aware of only a handful of meetings that might have qualified as some time spent pursuant to the Co-Chief Medical Officer and Medical Director duties required by Dr. Silver's contract. These meetings, if held and if attended, would have fallen far short of the 80 hours required every four weeks to satisfy the minimum requirements of the Co-Chief Medical Officer and Medical Director duties.

157. In short, Dr. Silver's Co-Chief Medical Officer and Medical Director position, requiring a minimum of 20 hours a week spent on a significant variety of administrative duties and responsibilities, was a sham, intended, among other things, to reward and induce referrals.

## VI. DR. HILLARY HAWKSINS'S MEDICAL DIRECTORSHIP

158. Hillary Hawkins's "Physician Employment Agreement" with SAPRA had an effective agreement date of January 1, 2014 and an expiration date of December 31, 2015. Signatories to this agreement were Dr. Hawkins and James E. Sok, then President and CEO on behalf of SAPRA.

159. Dr. Hawkins and SAPRA executed a post-expiration extension of this contract on August 1, 2016 for the period through September 30, 2016. Signatories to this amendment were Dr. Hawkins and Ellen B. Vance, Sheltering Arms' Chief Human Resources Officer, on behalf of SAPRA.

160. Dr. Hawkins's January 1, 2014 physician employment agreement contained the following

recitals:

"**Whereas,** Associates provides a full range of rehabilitation and physical medicine ("physiatry") services to patients who receive physical medicine and rehabilitation services from The Sheltering Arms Corporation (hereafter "Sheltering Arms") in its various inpatient and outpatient facilities, and at non-Sheltering Arms facilities with which Sheltering Arms has agreements wherever located (hereafter referred to collectively as "Sheltering Arms Facilities");

**Whereas,** Associates has determined that the efficient and effective delivery of physiatry services to its patients can best be achieved by employing on a full-time basis physician with training and experience in physiatry.

**Employment.** Associates hereby employs Physician to provide medical services in the specialty of physiatry to patients who receive care at Sheltering Arms Facilities. Physician hereby accepts such employment and agrees to serve in such capacity in accordance with this Agreement and any specific procedures and guidelines detailed within Sheltering Arms policies . . .

**Exclusivity.** Physician shall devote Physician's entire time, attention and energies to Sheltering Arms' business. Physician understands and agrees that throughout the Term of this Agreement Physician will be prohibited from engaging in the private practice of medicine and from providing the same or similar professional or managerial services to any other hospital or entity without advance written permission from Associates."

**Termination of Employment. Immediate Termination.** Physician's employment hereunder shall terminate immediately without notice upon the following events . . .

Conduct that endangers patient care or conflicts with applicable federal, state, or local laws or regulations . . .

Conduct by Physician that poses a threat to the health or safety of any patient . . .

Restriction, suspension, or loss of Physician's license to practice medicine in the Commonwealth of Virginia; or restriction, suspension or loss of certification to participate in Medicare or Medicaid;"

161. Dr. Hawkins's physician employment agreement also specified the full scope of her required duties, including professional clinical services, on-call coverage, training of medical students, networking, administrative duties, and meetings and committees.

162. Dr. Hawkins's physician employment agreement also required detailed timekeeping:

"**Records of Services Provided.** Physician shall fully document, on a timely and legible basis, all services performed under this Agreement consistent with the requirements of Associates, third-party payors, and applicable regulatory agencies. This documentation shall become part of the medical record maintained by Associates or the applicable Sheltering Arms Facility. The documentation shall be sufficiently detailed to enable Associates and a third party, if applicable, to verify: (i) the services provided; (ii) the amount of time allocated for the provision of Physician's services to identifiable patients; (iii) the amount of time allocated for the provision of Physician's services to Sheltering Arms; and (jv) the amount of time allocated for community contacts, research, or other activities.

163. Dr. Hawkins's physician employment agreement provided that "Associates shall pay Physician $190,000.00 per twelve (12) month period during the Term of the Agreement ("Base Pay"). Dr. Hawkins was also entitled a "Quality & Productivity Bonus" related to the "total amount properly coded and billed for all clinical Qualified Services."

164. Dr. Hawkins's total 12-month compensation under the physician employment agreement with SAPRA was capped at $360,000.00.

165. In addition to and separate from the physician employment agreement executed with SAPRA, Dr. Hawkins also signed agreements to serve as "Co-Chief Medical Officer" and "Medical Director" with SAH. Dr. Hawkins served in these positions, however named, every year since 2009.

166. For example, on June 30, 2015, Dr. Hawkins and Sheltering Arms Hospital executed a "Co-Chief Medical Officer and Medical Director Agreement," with an effective date of July 1, 2015 and a term through June 30, 2017. The signatories to the agreement were Dr. Hawkins and James E. Sok, as CEO and President of Sheltering Arms Hospital.

167. This agreement contained the following recitals:

"WHEREAS, SAH provides a full range of rehabilitation and physical medicine services to the community in Richmond, VA and surrounding areas;

WHEREAS, many patients in need of physical medicine and rehabilitation services are referred to SAH for such care;

WHEREAS, SAH requires the services of a licensed and qualified physician to conduct certain administrative and supervisory duties (collectively referred to as the "Duties") as the Co-Chief Medical Officer and Medical Director of SAH;

WHEREAS, Physician possesses appropriate credentials and wishes to be engaged by SAH to conduct such duties at SAH in accordance with the provisions set forth herein . . ."

168. Dr. Hawkins's agreement with SAH to serve as Co-Chief Medical Officer and Medical Director of SAHS included the following terms:

"**Conduct of Duties**: Physician shall conduct the following duties:

    (c)    Physician shall be responsible for the duties specified further in *Exhibit A* attached hereto and incorporated herein, and such other duties as may be required by applicable law or regulation or as may be reasonably requested by the *Sheltering Arms Vice President Medical Services & Strategic Development* or the *President/CEO of Sheltering Arms*. Physician shall comply with all currently accepted and approved methods and practices applicable to the services provided hereunder.

    (d)    Physician shall carry our duties and provide associated services on a schedule to be determined mutually by Physician and the *Sheltering Arms Vice President Medical Services & Strategic Development* or the *President/CEO of Sheltering Arms*. It is understood at the outset of this Agreement that no fewer than 20 hours per week will be devoted to the SAHS inpatient programs.

**Physician Qualifications.** Physician shall assure that at all times during the term and any renewal of this Agreement, she shall . . . Hold a currently valid, unrestricted and unlimited license to practice medicine in the Commonwealth of Virginia.

**Applicable Standards**. Physician shall perform all duties and services in accordance with all applicable requirements, standards, rulings and regulations of the Joint Commission, the U.S. Department of Health and Human Services, the Virginia Department of Health and Public Welfare and any other federal, state, or local government agency or authority exercising jurisdiction over SAH as well as all applicable SAH policies and procedures which may be in effect and amended from time to time. Physician shall perform services in conformance with all applicable legal requirements.

**Professional Services**. SAH acknowledges that Physician may provide professional services for patients of SAH under an Employment Agreement with Sheltering Arms Physical Rehabilitation Associates, LLC (SAPRA). Such professional services are independent of the Services under this current Agreement. SAPRA shall bill independently for such professional services.

> No Assignment or Subcontract. Neither this Agreement, not any of the duties and responsibilities of the Physician under this Agreement, may be assigned or subcontracted by Physician. This agreement may be assigned or subcontracted by SAH only to another Sheltering Arms entity."

169. Exhibit A of Dr. Hawkins's Co-Chief Medical Officer and Medical Director of SAH agreement listed more than 30 specific duties and responsibilities Dr. Hawkins was required to perform or manage in addition to her clinical inpatient work performed pursuant to her agreement with SAPRA, including:

> The Co-Chief Medical Officer and Medical Director shall function as a full member of the Sheltering Arms leadership team with regard to organizational challenges, initiatives, and activities:
>
> - Align departmental and personal goals with those of the organization
> - Focus on organization-wide financial considerations while also being involved considerations (sic) related to physician productivity and compensation
> - Provide leadership with regard to system changes
> - Collaborate in "networking" and the development of strategic alliances relevant to referral development, program/service development, research program involvement, and responsiveness to opportunities
> - Demonstrate commitment to complete discretion and confidentiality
> - Promote the mission and vision of the organization
>
> The Co-Chief Medical Officer and Medical Director will provide leadership for the Hospital and associated clinics at all levels:
>
> - Daily oversight of physicians to insure quality, safety, and efficiency of care
> - Daily oversight with regard to utilization of resources
> - Leadership regarding broad growth and improved efficiency of the Hospital inpatient operation
>   - Criteria and processes regarding referrals & admissions
>   - Length of stay management
>   - Documentation management
>   - Neurorehabilitation services
> - Growth and improved efficiency of outpatient services
>   - Interventional pain medicine
>   - EMG services
>   - Industrial rehab services
>   - Spasticity continuum and related neurorehab initiatives

- o   Other new program and service proposals
- Collaboration in recruitment and development of physicians
- Leading initiatives producing gains in surveyed patient satisfaction

The Co-Chief Medical Officer and Medical Director will provide leadership for the Hospital with regard to Compliance, at all levels:

- Monitor and lead revision of physician documentation formats and templates to insure meeting the standards or NGS, CMS, TJC and other regulatory entities
- Collaborate with regard to preparation for NGS, RAC and other audit processes
- Provide oversight with regard to coding guidelines
- Provide leadership to insure ongoing compliance with regard to institutional policies, procedures and priorities related to safety, quality, efficiency and utilization

The Co-Chief Medical Officer and Medical Director will participate and demonstrate leadership with regard to standard organizational meetings and committees (in addition to those requiring all physicians):

- Meetings of the Board of Directors – up to 10 per year
- Quarterly Performance Improvement Steering Committee (PISC) meetings
- Quarterly Environment of Care meetings
- President's Council meetings
- Ad Hoc Planning meetings and Retreats
- Consistent meetings with the *Sheltering Arms Vice President Medical Services & Strategic Development* or the *President/CEO of Sheltering Arms,* with focus areas to include the following:
  - o   Hospital administrative challenges and solutions
  - o   Significant or recurrent variances in medical care
  - o   Status of relationships with Hospital case managers and admissions coordinators
  - o   Status of relationships with other members of the rehabilitation teams
  - o   Quality of care considerations
  - o   Practice of evidence-based I (sic) best practice medicine
  - o   Clinical competence
  - o   Opportunities for improvement in patient care quality, safety, and/or efficiency
  - o   Adherence to CMS, NGS, TJC standards
  - o   Adherence to Sheltering Arms policies and procedures
  - o   Professional behavior
  - o   Timely completion of medical records

>The Co-Chief Medical Officer and Medical Director will perform such other duties as may be reasonably requested by Sheltering Arms from time to time.

170. In addition, Dr. Hawkins' Co-Chief Medical Officer and Medical Director contract provided that SAH may terminate her immediately, without notice, for cause in certain situations, including:

>"Termination for cause:
>
>Conduct that endangers patient care or conflicts with applicable federal, state or local laws or regulations;
>
>Conduct by Physician that poses a threat to the health or safety of any patient . . .
>
>Restriction, supervision, or loss of Physician's license to practice medicine in the Commonwealth of Virginia . . ."

171. Dr. Hawkins's compensation for the Co-Chief Medical Officer and Medical Director duties required SAHS to pay her, as memorialized by her contract, "$149,325 annually for each twelve month term of the Agreement . . . Such compensation amounts are fair market value for the services to be rendered."

172. The Co-Chief Medical Officer and Medical Director agreement also provided for two additional bonus opportunities for Dr. Hawkins: (1) Dr. Hawkins "may be eligible for specified performance incentive payments, as available to the Sheltering Arms senior management team" and (2) "In addition to compensation as detailed above, Physician shall be eligible for an annual bonus based on performance related to specific criteria pertaining to administrative duties. The annual potential bonus may change from time to time (currently the bonus potential is up to 30% of [$149,325])."

173. According to publicly-available documents, Sheltering Arms Hospital, which only employed Dr. Hawkins as a Medical Director, reported Dr. Hawkins's 2014 base compensation as $350,164 and reported an additional $126,940 in bonus and incentive

compensation for a total of $477,104. For 2015, Sheltering Arms Hospital reported Dr. Hawkins's total compensation as $469,506.

174. Dr. Hawkins attempted to amend and extend her July 1, 2015 Co-Chief Medical Officer and Medical Director agreement after it expired, executing an extension amendment on August 10, 2017 for the period through September 30, 2017.

175. This agreement indicated an amendment to "paragraph 4.1," of the Co-Chief Medical Officer and Medical Director employment agreement. Paragraph 4.1 is the "Term" paragraph indicating the agreement's duration of July 1, 2015 through June 30, 2017. The proposed amended text, however, reads, "2. Term." Paragraph 2 is the "Term" paragraph of Dr. Hawkins's Physician Employment Agreement with SAPRA.

176. Instead of executing this extension with SAH, for whom she was supposed to be providing the indicated Co-Chief Medical Officer and Medical Director services, Dr. Hawkins executed this extension with *SAPRA*. Signatories to the amendment were Dr. Hawkins and Ellen B. Vance, Sheltering Arms' Chief Human Resources Officer, for "Employer, Sheltering Arms Physical Rehabilitation Associates, LLC". No one signed the amendment to the Co-Chief Medical Officer and Medical Director agreement on behalf of SAH, the supposed actual employer of Dr. Hawkins's "Medical Director" services.

177. Because SAHS and SAPRA are separate legal entities and because of the delineated, non-overlapping contractual requirements of the physician employment agreement and the separate Medical Director agreement, the extension should have been executed between Dr. Hawkins and SAH, as originally drafted.

178. Regardless of the validity of this amendment and extension through September 30, 2017, Relator was unaware of any further extension of Dr. Hawkins's Co-Chief Medical Officer and Medial Director agreement with SAH through the end of Relator's tenure at SAPRA in March of 2018.

179. Relator was directly responsible for monitoring the day to day operations of the Sheltering Arms Physician and Psychology practices.    Specifically, Relator was responsible for the management of SAPRA and the SAPRA physicians, including Dr. Hawkins, who reported to the President and CEO.

180. Relator had direct knowledge of all relevant aspects of physician performance and compensation.  Relator knew that Dr. Hawkins was scheduled to work full-time, 40-hour work weeks as a SAPRA physician providing clinical patient care.

181. In dereliction of her contractual obligation to keep detailed records of her time and services for both SAPRA and non-SAPRA work, Dr. Hawkins did not keep detailed time records of her SAPRA and non-SAPRA work.

182. Had any records been kept, they would have shown both (1) that Dr. Hawkins worked as a full-time SAPRA physician providing clinical care to patients and, (2) that Dr. Hawkins did not perform a minimum of twenty hours a week performing her contractually required duties as Co-Chief Medical Officer and Medical Director for SAH.

183. For the 2017-2018 timeframe for example, Dr. Hawkins's pay-period time, indicted as "PP Hours," shows "40" for a two-week period for her work as a "physician."  Dr. Hawkins's pay-period time for her non-physician work, indicated as "Director Medical Director," similarly shows "40" for a two-week period.  Together, these entries are meant to indicate that Dr. Hawkins spent half of a 40-hour week working as a clinician seeing

patients and directly overseeing patient care, while spending the other half of her time

working her myriad duties as Co-Chief Medical Officer and Medical Director for SAH.

184. The information relating to Dr. Hawkins's "PP Hours" is false.

185. Dr. Hawkins did not spend half of a 40-hour work week on her duties as Co-Chief
Medical Officer and Medical Director duties for SAH.   Instead, as scheduled by
Sheltering Arms, Dr. Hawkins worked a full, 40-hour a week schedule providing clinical
care to patients.

186. As with Dr. Silver, Dr. Hawkins's SAPRA physician employment agreement also
required her to perform some non-clinical, administrative duties from time-to-time.  To
the extent Dr. Hawkins provided such services, they could not count towards her 20-hour
weekly minimum of Medical Director duties by the plain terms of the Medical Director
agreement:

> <u>Professional Services</u>.   SAHS acknowledges that Physician may provide
> professional services for patients of SAHS under an Employment Agreement with
> Sheltering Arms Physical Rehabilitation Associates, LLC (SAPRA).   Such
> professional services are independent of the Services under this current
> Agreement.  SAPRA shall bill independently for such professional services.

187. The time split reflected in the Sheltering Arms spreadsheet for Dr. Hawkins is a fiction,
created to support the false idea that Dr. Hawkins sacrificed half of her clinical patient
time to administrative Medical Director duties.

188. Like Dr. Silver, Dr. Hawkins regularly earned productivity bonuses tied to the volume of
her relative value units ("RVU"s) and related performance metrics.  Dr. Hawkins would
not have been able to earn any such bonuses if she only spent half of her time a week
with patients.  All of Dr. Hawkins's RVU and other performance bonus goals – set by

Sheltering Arms administrators - were based on the full-time clinical work schedule she actually performed.

189. Sheltering Arms administrators, including the CEO and President, COO, CFO, and Chief Human Resources Officer, all knew that Dr. Hawkins did not work the required minimum time as Medical Director. In addition, those same individuals all knew that Dr. Hawkins did not keep the required records to show how all of Dr. Hawkins's time was spent.

190. Relator was aware of only a handful of meetings that might have qualified as some time spent pursuant to the Co-Chief Medical Officer and Medical Director duties required by Dr. Hawkins' contract. These meetings, if held and if attended, would have fallen far short of the 80 hours required every four weeks to satisfy the minimum requirements of the Co-Chief Medical Officer and Medical Director duties.

191. In short, as with Dr. Silver, Dr. Hawkins's Co-Chief Medical Officer and Medical Director position, requiring a minimum of 20 hours a week spent on a significant variety of administrative duties and responsibilities, was a sham, intended, among other things, to reward and induce referrals.

## VII. DR. HAWKINS'S VIRGINIA BOARD OF MEDICINE REPRIMAND AND LICENSE RESTRICTIONS

192. On January 23, 2017, The Commonwealth of Virginia, Department of Health Professions, Virginia Board of Medicine ("BOM") initiated Disciplinary Proceedings against Dr. Hawkins related to her care and treatment of four patients over a twenty-year period while Dr. Hawkins worked for SAPRA and SAH. The BOM's case number for this matter is 160106.

193. Specifically, the BOM alleged possible violations of Virginia Code § 54.1-2915.A(3) and (13). The matter proceeded to informal conference on March 8, 2017. As a result of the informal conference, the BOM issued an Order on March 29, 2017 upholding Dr. Hawkins's four violations of Virginia Code § 54.1-2915.A(3) and (13) from 1995 through 2015.

194. The BOM's Order on case 160106 became final on May 3, 2017.

195. As a result of these findings, the BOM reprimanded Dr. Hawkins and restricted her practice of medicine, placing "terms and conditions," on her license requiring, inter alia, that she complete certain specific requirements within three, nine, and twelve months of the date of entry of the BOM's Order.

196. On December 7, 2017, the BOM informed Dr. Hawkins that "the terms and conditions placed on your license should be TERMINATED effective this date. Our records have been updated to reflect that you have a full and unrestricted license to practice in the Commonwealth of Virginia." (original emphasis).

197. In contradiction of all her professional and contractual obligations, Dr. Hawkins did not contemporaneously inform anyone at any Sheltering Arms entity of any aspect of the BOM inquiry, order, or reprimand.

198. The BOM's findings specific to Code of Virginia §54.1-2915.A(3) and (13) and the placement of restrictions on her medical license (for a period from March 2017 through December 2017 until the BOM indicated her license was then "unrestricted) should have caused SAPRA to immediately terminate Dr. Hawkins pursuant to the "Termination of Employment – Immediate Termination" clauses of her physician employment agreement with SAPRA, as cited above.

199. Similarly, the nature of the BOM's findings should have also triggered an immediate review by SAH as to whether Dr. Hawkins needed to be immediately fired pursuant to the "Termination for cause" clause of her Co-Chief Medical Officer and Medical Director agreement.

200. At first, SAPRA and SAH's failure to act was the necessary result of Dr. Hawkins's failure to inform the Sheltering Arms' Credentials Committee or anyone else at SAPRA or SAH of the BOM Order.  This failure was yet another, independent basis for termination.

201. In approximately late 2017, Sheltering Arms became aware of the BOM order after a third-party payor, as part of the payor's own credentialing process, discovered the public records related to Dr. Hawkins's BOM reprimand and contacted SAH.

202. At that time, SAPRA and SAH executives, including Mary Zweifel, Jim Litsinger, Amy Showalter, and Ellen Vance were aware of the contractual requirements pertaining to the BOM's specific findings and Dr. Hawkins's restricted license.

203. Neither SAPRA, nor SAH terminated Dr. Hawkins from her employment or imposed any other disciplinary action.

204. Specifically, Relator had conversations with Ms. Showalter and Mrs. Zweifel where Relator recommended terminating Dr. Hawkins's SAPRA and SAH contracts.

205. Both Ms. Zweifel and Ms. Showalter told Relator that they were not going to terminate Dr. Hawkins and both specifically pointed to the volume of Dr. Hawkins's Sheltering Arms' work and the resulting significant volume of her billing revenue and outpatient referrals.

206. Ms. Showalter, to whom Relator reported, was critical of Relator for raising any work performance or contractual requirement issues with, or involving, Dr. Hawkins, including the issues related to the BOM Order. When the Sheltering Arms Credentials Committee met to discuss Dr. Hawkins's BOM Order, Relator was excused from attendance, despite being a staff support member. The Credentials Committee took no action against Dr. Hawkins.

207. Despite the BOM's Order, Dr. Hawkins continued in both of her contractual roles with SAPRA and SAH without limitation (other than adhering to the BOM's requirement that she transition certain patients to other qualified providers). Dr. Hawkins continued to provide full-time clinical patient care at SAH. This included the entire time that Dr. Hawkins's medical license was restricted by the Virginia BOM.

208. Neither SAPRA nor SAH took any action with respect to Dr. Hawkins as a result of the BOM Order and Dr. Hawkins's subsequent failure to bring the Order to the attention of anyone at Sheltering Arms.

### VIII. DR. GREGORY LEGHART'S EMR "PHYSICIAN CHAMPION" SALARY

209. Gregory Leghart's "Physician Employment Agreement" with SAPRA had an effective agreement date of January 1, 2016 and an expiration date of December 31, 2016. Signatories to the agreement were Dr. Leghart and Ellen B. Vance, SAH's Chief Human Resources Officer, on behalf of SAPRA.

210. Dr. Leghart and SAPRA executed a post-expiration extension of this contract on March 23, 2017 for the period from January 1, 2017 through August 31, 2017. Signatories to the agreement were again Dr. Leghart and Ellen B. Vance, SAH's Chief Human Resources Officer, on behalf of SAPRA.

211. Although a further extension of this contract was prepared for the period of time through September 30, 2018, Dr. Leghart had refused to sign it. As of the time of Relator's departure from SAPRA, Relator was unaware that Dr. Leghart had executed any extension. Intended signatories to the agreement were again Dr. Leghart and Ellen B. Vance, SAH's Chief Human Resources Officer, again on behalf of SAPRA.

212. Dr. Leghart's January 1, 2016 employment agreement contained the following recitals, including his non-clinical responsibilities related to the implementation of an electronic medical record system at SAH:

> "**Whereas,** Associates provides a full range of rehabilitation and physical medicine ("physiatry") services to patients who receive physical medicine and rehabilitation services from The Sheltering Arms Corporation (hereafter "Sheltering Arms") in its various inpatient and outpatient facilities, and at non-Sheltering Arms facilities with which Sheltering Arms has agreements wherever located (hereafter referred to collectively as "Sheltering Arms Facilities");
>
> **Whereas,** Associates has determined that the efficient and effective delivery of physiatry services to its patients can best be achieved by employing on a full-time basis physician with training and experience in physiatry;
>
> **Employment.** Associates hereby employs Physician to provide medical services in the specialty of physiatry to patients who receive care at Sheltering Arms Facilities and to provide such other services as set forth in this Agreement related to the implementation of an Electronic Medical Record (EMR[3]) by Sheltering Arms Hospital . Physician hereby accepts such employment and agrees to serve in such capacity in accordance with this Agreement and any specific procedures and guidelines detailed within Sheltering Arms policies . . .
>
> **Exclusivity.** Physician shall devote Physician's entire time, attention and energies to Sheltering Arms' business. Physician understands and agrees that throughout the Term of this Agreement Physician will be prohibited from engaging in the private practice of medicine and from providing the same or similar professional or managerial services to any other hospital or entity without advance written permission from Associates."

---

[3] Defendants used "EMR" or "EHR" (electronic health record), or later, "CareLink," interchangeably to describe the same project and services.

213. Dr. Leghart's employment agreement also specified the full scope of his required duties, including: professional clinical services, on-call coverage, admission consulting services, training of medical students, networking, administrative duties, and meetings and committees.

214. In addition, Dr. Leghart agreed to perform additional duties related to the adoption of EMR:

**EMR Implementation:** Physician shall serve as the Physician Champion as part of the Sheltering Arms EMR implementation team. In this role, Physician is expected to positively influence other physicians to participate in and embrace the technical and operational changes that will result from the deployment of EMR. This will require approximately 50% of Physician's full time work hours during 2016 although the specific level of effort will vary from week to week during the year. Specifically, Physician will perform the following specific services:

     i.     Participate in the development and execution of the clinical improvement and development strategies, including clinical efforts for improved patient outcomes, reduced variations in care, and enhanced physician engagement;

     ii.    Oversee the implementation and continued use of the electronic health record and other clinical informatics systems, including analytical tools, to support quality and performance improvement initiatives;

     iii.   Serve as liaison to the clinical staff, medical executive committees, clinical departments, and other constituents to use informatics to promote the clinical agenda;

     iv.   Support the evaluation and continued improvement of clinical practice environments;

     v.    Support innovative patient care initiatives;

     vi.   Identify and pursue research and development initiatives to support quality and patient safety efforts;

     vii.   Improve clinician adoption, acceptance, and use of information technology while enhancing physician satisfaction with the clinical information system;

     viii.  Manage expectations of clinical information system end-users;

     ix.   Monitor HHS "Meaningful Use" criteria of electronic medical records systems to ensure that the organization is meeting criteria ahead of deadlines;

     x.    Develop partnerships between clinical operations, clinical informatics systems, and researcher community at the medical center;

     xi.   Assist in creating an institutional culture that promotes patient safety and high standards of ethical conduct;

xii.    Demonstrate excellent skills in all forms of communication, and work well with others in the spirit of teamwork and cooperation;

xiii.   Demonstrate effective verbal and written skills including the ability to deliver effective presentations to myriad audiences.

215.  Dr. Leghart's employment agreement also required detailed timekeeping:

"**Records of Services Provided.** Physician shall fully document, on a timely and legible basis, all services performed under this Agreement consistent with the requirements of Associates, third-party payors, and applicable regulatory agencies. This documentation shall become part of the medical record maintained by Associates or the applicable Sheltering Arms Facility. The documentation shall be sufficiently detailed to enable Associates and a third party, if applicable, to verify: (i) the services provided; (ii) the amount of time allocated for the provision of Physician's services to identifiable patients; (iii) the amount of time allocated for the provision of Physician's services to Sheltering Arms; and (jv) the amount of time allocated for community contacts, research, or other activities.

216.  Exhibit I to Dr. Leghart's employment agreement provided that "Associates shall pay Physician $272,000.00 during the Term of the Agreement ("Base Pay").

217.  The Exhibit I is also captioned, "Exhibit I to Employment Agreement effective 7/1/2014 Between Sheltering Arms Physical Rehabilitation Associates, LLC and Gregory F. Leghart, MD, indicating that the base salary and bonus payment amounts were the same from July 1, 2014 through at least March of 2018.

218.  Unlike Dr. Hawkins and Dr. Silver, Dr. Leghart was not offered a Quality & Productivity Bonus related to the value of his services. Instead, he was entitled to receive "a bonus payment of $50,000 per year which shall be paid in quarterly installments of $12,500. In order to earn the bonus, Physician must complete all job requirements to the satisfaction of the Associates."

219.  Relator learned from Sheltering Arms administrators that Dr. Leghart's unique bonus clause was meant to compensate him for an expected loss of productivity resulting from the 50% time requirement related to the EMR project. Thus, Dr. Leghart could still earn

a substantial bonus even if he could not meet RVU and productivity goals based on seeing patients through his clinical practice.

220. Dr. Leghart's total 12-month compensation under the agreement with SAPRA was capped at $415,000.00.

221. In its 2014 Annual Report, Sheltering Arms discussed progress with its adoption of Electronic Medical Records:

> "The process of transitioning to electronic medical records has begun with the selection of Cerner as Sheltering Arms' solutions provider. This process involves a major investment of resources, both in terms of time and money. Full implementation will occur over the next two years . . ."

222. In its 2015 Annual Report, Sheltering Arms again discussed the electronic records program:

> "Electronic Health Records: our electronic health records (EHR) initiative is well under way. Sheltering Arms is working with Cerner, a highly-respected leader in the EHR industry. Using Cerner's technology as a framework, specialists from all sectors of the Sheltering Arms organization are thoroughly evaluating current systems, determining needs moving forward, and planning the implementation of our specialized tool rollout for 2017.
>
> We welcomed several new members to our IT team with specific knowledge integral to ensuring a smooth and successful process. They, along with physicians, nurses, therapists and administrative staff, have dedicated many hours to developing a comprehensive end product.

> The named voted by staff for the new EHR is "Care Link" . . ."

223. In its 2016 Annual Report, Sheltering Arms again updated its status on implementing Care Link:

> "The electronic medical records (EMR) implementation is nearly two-thirds complete. The CareLink project team defined the current state of our system and is busy building the future system."

224. In a June 2018 newsletter for employees of Sheltering Arms, Mary Zweifel, as President and CEO, provided an update about CareLink:

"A SUCCESSFUL CARELINK LAUNCH: As you know, June 1 marked a very important event in the history of Sheltering Arms – the launch of CareLink, our new Cerner-based electronic health record."

225. At the time of Relator's departure from SAPRA in March of 2018, Dr. Leghart's last physician employment agreement had expired August 31, 2017.

226. The EHR/CareLink project encountered difficulties that significantly delayed the project. Ultimately, an additional external contractor was brought into the project in 2017 to help complete the four-year conversion.

227. Similar to Dr. Silver and Dr. Hawkins, Dr. Leghart's contract required him to spend literally half of what would have been clinical patient care time on administrative tasks – in this case, "50%" of his time on the Cerner CareLink project.

228. Relator, as the Associate Vice President of the Sheltering Arms Physician and Psychology practices, knew that Dr. Leghart was still scheduled to work full-time, 40-hour work weeks as a SAPRA physician providing clinical patient care.

229. Similar to Dr. Silver and Dr. Hawkins, Dr. Leghart did not keep detailed time records of his work for any of his SAPRA duties, including the EHR project.

230. Had any records been kept, they would have shown both (1) that Dr. Leghart worked as a full-time SAPRA physician providing clinical care to patients and, (2) that Dr. Leghart did not spend 50% of his time as Physician Champion of the EHR project.

231. Sheltering Arms' own documents confirm that Dr. Leghart was generally scheduled for full-time clinical patient care.

232. For the 2017-2018 timeframe, a Sheltering Arms spreadsheet shows that Dr. Leghart's pay-period time, indicted as "PP Hours," was "80" for a two-week period for his work as a "physician." 80 hours for a two-week period was indicative of full-time work as a

physician seeing patients, not a physician spending 50% of his time on administrative tasks related to the EHR project.

233. Sheltering Arms work schedules would confirm that Dr. Leghart was generally scheduled to work full-time 40-hour weeks providing clinical care to patients.

234. Sheltering Arms administrators, including Mary Zweifel and Amy Showalter, were not only aware that Dr. Leghart did not work the required 50% of his time on the EMR project, they openly complained about to Relator. Specifically, they complained that Dr. Leghart was getting paid for EHR but not doing much work on the project for significant periods of time.

235. However much time Dr. Leghart spent on the EMR conversion, he could never have spent 50% of his full-time work on it, as required by contract, because of his scheduled patient workload.

236. Further, despite their complaints to Relator, Sheltering Arms administrators continued to pay Dr. Leghart his full salary and his $50,000 bonus for satisfactorily performing his EMR project duties. Mary Zweifel and Amy Showalter expressed to Relator their view that Dr. Leghart, as one of Sheltering Arms' "big three," referral sources, had to be treated well and "kept happy."

237. In short, Dr. Leghart's paid position as "Physician Champion," requiring a minimum of 20 hours or 50% of his time each week spent on administrative duties and responsibilities, was a sham.

238. In addition to condoning the lack of performance, some specific contractual EMR duties are vacuously general and appear to have been no more than filler, for example:

    xiv.    Demonstrate excellent skills in all forms of communication, and work well with others in the spirit of teamwork and cooperation;

      xv.      Demonstrate effective verbal and written skills including the ability to deliver effective presentations to myriad audiences.

239. While some EHR duties were expected from and provided by Dr. Leghart, it was never possible or practicable for him to dedicate half of his patient care work hours (20 hours a week) to the project. Thus, Defendants' actions show that the EMR project position was not commercially reasonable.

240. In addition, Dr. Leghart was paid for the EHR duties even when the EMR project was significantly delayed (when he would have nothing to "champion").

241. To the extent that Dr. Leghart's EMR duties were required in a contract that expired August 31, 2017, there has been no basis for any payments related to EMR since that time.

242. Prior to being paid as "Physician Champion" of the Sheltering Arms EHR project, Dr. Leghart was a named "Medical Director" for at least four different Sheltering Arms rehabilitative care programs (Functional Restoration/Back to Work Program, Brain Injury Program, Spasticity Program, and Stroke Rehabilitation Program).

243. Despite the continued existence of those programs to the present day, and the need for them to have had a Medical Director at one time, no other Sheltering Arms physician has been named to replace Dr. Leghart as Medical Director in those specific roles. In addition, neither Dr. Silver nor Dr. Hawkins's Co-Chief Medical Officer and Medical Director agreements enumerates or specifies any duty related to those (or any) specific programs.

## IX.    DR. ALBERT JONES'S MEDICAL DIRECTORSHIP

244. Dr. Albert Jones has been employed by a Sheltering Arms entity since 1988 and served as "Medical Director" of a Sheltering Arms entity for approximately 17 years. In addition,

Dr. Albert Jones served as Medical Director of a discontinued Sheltering Arms program known as "Day Rehab." Dr. Albert Jones was paid additional compensation for his Medical Director positions in addition to the salary he received for his clinical care services under a physician employment agreement.

245. Dr. Albert Jones has continued to be paid quarterly compensation as a Medical Director for the "Day Rehab" program even after his nominal responsibilities for that role, and the program itself, ended.

246. In its 2010 Annual Report, Sheltering Arms reported that $75,100 had been provided to patients in the Day Rehab program in need of transportation.

247. In its 2011 Annual Report, Sheltering Arms listed the Day Rehab program as based at the Bon Air Center. The Bon Air Center is one of Dr. Albert Jones's primary workplaces.

248. No Sheltering Arms Annual Report subsequent to 2011 has mentioned the Day Rehab program. No Sheltering Arms Annual Report subsequent to 2011 has identified a location where the Day Rehab program was located or performed.

249. Dr. Albert Jones signed a physician employment agreement with SAPRA on or about December 17, 2014 with an end date of December 31, 2016. That physician employment agreement was extended through December 31, 2017. From that time through at least March of 2018, Dr. Albert Jones had refused to sign any further extension of his physician employment agreement with SAPRA.

250. For 2017, Dr. Albert Jones was paid a base salary of $249,995.20 for his full-time work as a physician for SAPRA. A Sheltering Arms spreadsheet reflects his status as a full-time physician with responsibility for 80 "PP Hours" of work for each two-week period (an average of 40 hours a week).

251. Dr. Albert Jones was scheduled to work full-time 40-hour weeks providing clinical care to patients.

252. On multiple occasions during his time at Sheltering Arms, Relator raised specific issues related to Dr. Albert Jones's contract and pay.

253. Specifically, through the course of his employment for Sheltering Arms, Relator learned that Dr. Albert Jones was still being paid as a Medical Director for the Day Rehab program, when that program had ceased to exist for years.

254. Relator discussed with Mary Zweifel, Jim Litsinger, Ellen Vance, and Amy Showalter, among others, his concern that Dr. Albert Jones continued to be paid for serving as a Medical Director of the Day Rehab program when that program no longer existed to serve and Sheltering Arms patients.

255. Relator was told, specifically by Mary Zweifel and Amy Showalter, that they were aware that Dr. Albert Jones was being paid for the medical directorship that no longer existed but wanted to keep Dr. Albert Jones "happy." Dr. Albert Jones was a well-liked physician who treated particularly complex cases.

256. Despite their acknowledgement of the impropriety of continuing to pay Dr. Albert Jones for Medical Director responsibilities he no longer had, Mary Zweifel and Amy Showalter took no action to end the payments, but instead chose let them continue for years with full knowledge that Dr. Albert Jones was being paid for something he did not do.

## X.     SAPRA OPERATED AT A SIGNIFICANT FINANCIAL DEFICIT AND WAS FUNDED BY SAH AND SAF

257. The SAPRA practice ran at a deficit.  In 2014 tax filings, SAH, the direct controlling entity of SAPRA, reported that SAPRA had a loss of $2,889,058.  In 2015, SAH reported SAPRA's income as a loss of $3,238,189.

258. At all times relevant to this Complaint, the non-profit SAH provided direct financial support to SAPRA, a for-profit LLC.  SAF, in turn, provided direct financial support to SAH.

259. Without the funds provided by SAH (and indirectly from SAF), the SAPRA losses would have been even greater.

260. Throughout the time of the payment of these subsidies, SAPRA physicians continued to generate outpatient therapy referrals of their patients to Sheltering Arms outpatient therapy facilities, whose patients included beneficiaries of Medicare, Medicaid, TRICARE, CHAMPVA, FEHB, and other Federally-funded health care programs.

261. While employed by SAH, Relator participated in ongoing conversations with senior Sheltering Arms administrators, including Mary Zweifel, Jim Litsinger, and Amy Showalter, about both the fact of annual subsidies to SAPRA and the administrators' stated desire to reduce the amount of the support.

262. In the context of these conversations, Relator repeatedly raised the issue of doctor compensation as it related to fair market value and commercial reasonableness. Specifically, Relator expressed concern about funding SAPRA's significant operating losses when some SAPRA physicians (Dr. Silver, Dr. Hawkins, Dr. Leghart, and Dr. Albert Jones) were paid well in excess of others and were also paid for work that was not done.

263. Consistent with the sham medical directorships and similar positions discussed herein, SAH's funding of SAPRA operations was a way to reward and induce continued referrals of patients for outpatient therapy procedures to the various locations of the Sheltering Arms Physical Rehabilitation Centers, including patients who were beneficiaries of Medicare, Medicaid, TRICARE, CHAMPVA, FEHB, and other Federally-funded health care programs.

### XI.   DETAILED TIMEKEEPING WAS NOT PERFORMED AS REQUIRED

264. All SAPRA physicians were contractually required to keep detailed records of their time spent on clinical patient care as well as all non-clinical and administrative activities. While Relator worked at Sheltering Arms, none of the four physician Defendants, Dr. Silver, Dr. Hawkins, Dr. Leghart, or Dr. Albert Jones, kept records of their time as required by their respective physician employment agreements.

265. Had such records been kept and maintained, a review would readily have shown whether, with respect to Drs. Silver, Hawkins, and Leghart, the contractually-required minimum time expenditures (20 hours a week or 50% of Physician's full-time work hours) were met.

266. For Dr. Albert Jones, time records would confirm that he spent no time as Medical Director for the defunct Day Rehab Program.

267. Shortly after joining Sheltering Arms, Relator learned of the lack of compliance with the time-keeping requirements. He repeatedly brought the issue to the attention of Amy Showalter. Ms. Showalter took no action other than to reply that the matter had to be handled by Ms. Zweifel. Relator participated in additional discussions with Ms. Showalter, Ms. Zweifel, and Ms. Vance, voicing his concern over the lack of

timekeeping.  While all three acknowledged the failure to keep time, no steps were taken to correct the lack of compliance.

268. Thus, Sheltering Arms administration, including Mary Zweifel, Ellen Vance, and Amy Showalter, were fully aware that these physicians were not complying with the contractual time-keeping requirements.  In fact, the administrators often expressed their own belief and awareness that contractually-required minimum hours were not worked.  Despite their knowledge, however, the Defendants and their administrators never addressed the issue in order to keep the doctors, including "the big three," referral sources "happy at all costs."

269. Accurate time-keeping by the Defendants would have only shown that they did not fulfill their substantial, non-clinical time commitments as Medical Directors or Physician Champion.   Accurate time-keeping would have immediately revealed the Medical Director and Physician Champion positions to be what they were: sham positions intended to induce and reward referrals.

270. Sheltering Arms' and the SAPRA physicians' failure to keep detailed time records is consistent with Sheltering Arms' physician work schedules that show full-time, approximately 40-hour work weeks dedicated solely to clinical patient care.

271. Full-time work schedules would also show that, in direct contradiction of any nominal concern or complaint they may have voiced, Sheltering Arms administrators were ready, willing, and able to get the most from the physician Defendants and their outpatient therapy referrals.

## XII.   PHYSICIAN SALARIES WERE ABOVE FAIR MARKET VALUE AND THE ADDITIONAL POSITIONS NOT COMMERCIALLY REASONABLE

272. As Associate Vice President for Physicians' and Psychology Services, Relator was responsible for finding "benchmark" salary data for use in determining the fair market value ("FMV") relevant to each SAPRA physician's compensation.

273. In approximately late 2017, based on MGMA (Medical Group Management Association) data, Relator found that a median (50th percentile) salary for a hospital-affiliated physiatry practice physician like SAPRA was $259,757. The same source showed that a 75th percentile salary was $355,479. The 90th percentile for physiatrists in the region was $455,525.

274. Both Dr. Silver and Dr. Hawkins were scheduled to be paid at or above the 90th percentile in 2017 and 2018. Previous years' compensation for both Dr. Silver and Dr. Hawkins was similarly in that range of the MGMA scale.

275. As discussed herein, Sheltering Arms administrators tracked both physician employment agreement (SAPRA) and Medical Director (SAH) salaries on the same spreadsheet.

276. When determining FMV and reporting physician compensation in its Form 990s, however, despite the separate and discrete nature of their clinical and administrative salaries and positions, Sheltering Arms administrators reported Dr. Silver's and Dr. Hawkins' two salaries as an aggregate number, lumping the SAPRA salary with the SAH salary.

277. This was done, despite the stark differences between patient care for SAPRA and administration for SAH, because Sheltering Arms administrators viewed the aggregate compensation fundamentally as compensation for clinical patient care pursuant to the SAPRA physician employment agreement and responsibilities.

278. Had this been otherwise, Sheltering Arms administrators would have only used the base and bonus and incentive compensation under the SAPRA physician employment agreement for purposes of evaluating FMV for each physician.

279. The aggregate compensation numbers disclosed by SAH also show that compensation for Dr. Silver and Dr. Hawkins was above the contractual caps of their SAPRA physician employment agreements.

280. Outpatient physical therapy, occupational therapy, speech pathology and medical psychology referrals were simply too important to SAH, SAHS, and the other Sheltering Arms facilities for long-time referring doctors to ever suffer adverse treatment.

### XIII.  MATERIALITY

281. The fact that the Defendants' claims at issue were not permissible under the Stark Law and the Anti-Kickback Statute was material to the government's decision whether to pay those claims.

282. Defendants' false representations in their Medicare enrollment forms and claims—certifying prospectively and retrospectively that their claims complied with the Stark Law and the AKS—were material to Medicare's decision whether to pay Defendants' claims and were intended to induce Medicare to pay those claims.

283. Defendants understood at all times relevant to this lawsuit that compliance with the Stark Law and AKS were express, material conditions under which they would receive remuneration for their claims to Medicare and Medicaid and other Federally-funded programs.

284. Compliance with both the Stark Law and AKS goes to the essence of Medicare's bargain with participating healthcare providers, such as the Defendants.  Both laws play a vital

and important role in ensuring that services are reasonable and necessary, and not provided merely to enrich the parties to an unlawful arrangement at the expense of Federal health programs and their beneficiaries.

285. The violations alleged here are not inconsequential or insubstantial. The ways in which the Defendants violated the Stark Law and AKS implicate the core purpose of the Stark Law and AKS, including because Defendants' salaries and payments related to the medical directorships and the salary and payments for other administrative work were remuneration intended to induce and reward referrals of outpatient therapy procedures.

286. Defendants knew not only that such sham medical directorship work was not performed, but that it could not possibly have been be performed; and that paying for work that is not or cannot be performed can never be commercially reasonable and that compensation arising from such a relationship can never be at fair market value.

287. Nevertheless, Defendants knowingly and systematically paid compensation the physicians as alleged herein that resulted in false claims, as a result of which Defendants considerably enriched themselves at the expense of the United States and the Commonwealth of Virginia.

## FIRST CAUSE OF ACTION
### False Claims Act: 31 U.S.C. §3729(a)(1)(A): Presenting and Causing False Claims
### (All Defendants)

288. Relator incorporates by reference all paragraphs to this complaint set out above as if fully set forth here.

289. Pursuant to the Stark Law, 42 U.S.C. § 1395nn, it is unlawful for physicians to refer patients to receive certain "designated health services" ("DHS") payable by Medicare and Medicaid from entities with which the physician has a financial relationship. The Stark

Law expressly states that providers may not bill, and Medicare and Medicaid may not pay, claims for DHS referred in violation of the statute. 42 U.S.C. §§1395nn(a)(1),(g)(1). It is unlawful for an entity to present a claim or cause to be presented a claim for reimbursement to a third-party payor, including Medicare and Medicaid, based upon any service rendered as a result of that referral.

290. As alleged herein, by entering into agreements with Dr. Silver, Dr. Hawkins, Dr. Leghart, and Dr. Albert Jones, in the form of sham medical directorships or other agreements for remuneration, the Defendants violated the Stark Law.

291. The Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), is violated when one purpose of the payment or remuneration is to induce or reward referrals of services to be paid by Federal health care programs. The Anti-Kickback Statute specifically provides that claims arising from the giving or receiving of illegal remuneration are false or fraudulent claims for purposes of the Federal False Claims Act. 41 U.S.C. § 1320a-7b(g).

292. As alleged herein, by entering into agreements with Dr. Silver, Dr. Hawkins, Dr. Leghart, and Dr. Albert Jones, in the form of sham medical directorships or other agreements for remuneration, the Defendants violated the Anti-Kickback Statute.

293. Defendants violated the False Claims Act when they presented and caused to be presented materially false and fraudulent claims for payment or approval to the United States, including claims to Federally-funded healthcare programs for reimbursement of services rendered to patients who were referred as a result of sham agreements, in violation of the Stark Law and in violation of the Anti-Kickback Statute

294. Defendants presented or caused to be presented such claims with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

295. The United States sustained damages because of Defendants' wrongful conduct and submission of false claims.

**SECOND CAUSE OF ACTION**
False Claims Act: 31 U.S.C. §3729(a)(1)(B): False Statements Material to False Claims
(All Defendants)

296. Relator incorporates by reference all paragraphs to this complaint set out above as if fully set forth here.

297. Compliance with the Stark Law and Anti-Kickback Statute is a condition of payment of Medicare, Medicaid, TRICARE, CHAMPVA, FEHB, and other federally funded healthcare programs.

298. Defendants made, used, caused to be used or used false records or statements—i.e., the false certifications and representations made and caused to be made by Defendants when submitting the false claims for payment and the false certifications made by Defendants in submitting Medicare Enrollment Agreements to get false or fraudulent claims paid and approved by the United States, and that were material to the United States' payment of the false claims at issue in this case.

299. Defendants' false certifications and representations were made for the purpose of getting false or fraudulent claims paid by the United States, and payment of the false or fraudulent claims by the United States was a reasonable and foreseeable consequence of Defendants' statements and actions.

300. The false certifications and representations made and caused to be made by Defendants were material to the United States' payment of the false claims.

301. Defendants made or caused to be made such false records or statement with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

302. The United States sustained damages because of Defendants' wrongful conduct.

**THIRD CAUSE OF ACTION**
Virginia Fraud Against Taxpayers Act: Va. Code Ann. § 8.01-216.3 (A)(1):
Presenting and Causing False Claims
(All Defendants)

303. Relator incorporates by reference all paragraphs to this complaint set out above as if fully set forth here.

304. The Commonwealth of Virginia has complimentary laws to the Stark Law and the Federal Anti-Kickback Statute. Specifically, the Virginia Anti-Kickback statute, Va. Code § 32.1-315, the Virginia Fee Splitting Statute, Va. Code § 54.1-29.62, and the Virginia Practitioner Self-Referral Statute, Va. Code § 54.1-2411, all prohibit the same kickback and induced-referrals conduct proscribed by the Stark Law and the Federal Anti-Kickback Statute. Violations of the Virginia Anti-Kickback Statute, Virginia Fee Splitting Statute, and the Virginia Practitioner Self-Referral Statute which result in claims being made to the Commonwealth for payment are likewise false claims pursuant to the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.3.

305. Defendants violated The Virginia Fraud Against Taxpayers Act when they presented and caused to be presented materially false and fraudulent claims for payment or approval to the Commonwealth of Virginia, including claims to Virginia's Medicaid program, for reimbursement of services rendered to patients who were referred as a result of sham

medical directorships, in violation of the Virginia Anti-Kickback statute, Virginia Fee Splitting Statute, and the Virginia Physician Self-Referral Statute.

306. Defendants presented or caused to be presented such claims with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

307. The Commonwealth of Virginia sustained damages because of Defendants' wrongful conduct and submission of false claims.

### FOURTH CAUSE OF ACTION
Virginia Fraud Against Taxpayers Act: Va. Code Ann. § 8.01-216.3 (A)(2):
False Statements Material to False Claims
(All Defendants)

308. Relator incorporates by reference all paragraphs to this complaint set out above as if fully set forth here.

309. Defendants made, used, caused to be used or used false records or statements—i.e., the false certifications and representations made and caused to be made by Defendants when submitting the false claims for payment and the false certifications made by Defendants in submitting the required Virginia Medicaid Agreements to get false or fraudulent claims paid and approved by Virginia, and that were material to Virginia's payment of the false claims at issue in this case.

310. Defendants' false certifications and representations were made for the purpose of getting false or fraudulent claims paid by Virginia, and payment of the false or fraudulent claims by Virginia was a reasonable and foreseeable consequence of Defendants' statements and actions.

311. The false certifications and representations made and caused to be made by Defendants were material to Virginia's payment of the false claims.

312. Defendants made or caused to be made such false records or statement with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

313. The Commonwealth of Virginia sustained damages because of Defendants' wrongful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Relator, on behalf of himself individually and acting on behalf of the United States and the Commonwealth of Virginia prays that judgment be entered against Defendants as follows:

That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty for each violation, pursuant to the statute, with interest.

That Relator be awarded the maximum amount available under Sections 3730(d) and 3730(c)(5) of the False Claims Act.

That Relator be awarded all reasonable expenses that were necessarily incurred in prosecution of this action, plus all reasonable attorneys' fees and costs, as provided by 31 U.S.C. § 3730(d).

And, such other relief shall be granted in the favor of the United States, the Commonwealth of Virginia, and the Relator as this Court deems just and proper.

Relator hereby demands a jury trial.

DATED **M<u>AY 28, 2019</u>**

                                    Respectfully Submitted:

                                    Stephen E. Baril, Esq. (VSB #19604)
                                    Paul D. Anders, Esq. (VSB #31712)
                                    Kaplan Voekler Cunningham & Frank, PLC
                                    1401 East Cary Street
                                    Richmond, Virginia 23218
                                    (T): (804) 823-4003
                                    (F): (804) 823-4099
                                    E-mail: sbaril@kv-legal.com
                                    E-mail: panders@kv-legal.com

                                    Michael A. Lesser, Esq.
                                    (*NOT ADMITTED IN VIRGINIA*)
                                    Evan R. Hoffman, Esq.
                                    (*NOT ADMITTED IN VIRGINIA*)
                                    Thornton Law Firm LLP
                                    One Lincoln Street, 25th Floor
                                    Boston, MA 02111
                                    (T): 617-720-1333
                                    E-mail: mlesser@tenlaw.com
                                    E-mail: ehoffman@tenlaw.com